702 F.2d 1315
 13 Fed. R. Evid. Serv. 479
 UNITED STATES of America, Plaintiff-Appellee,
v.
Richard E. BLASCO, Catalino Chambrot, Angel Cruz, Nestor
Fernandez, Domingo Galvan, Sergio E. Galvan, Jose M. Garcia,
Antonio Hernandez, Francisco Avila Hernandez, Raul
Hernandez, Orlando Vidal Maldonado, Vincente Jose Martinez,
Richard Mungin, Mitchell Earl Noatch, Francisco Paco
Novales, Antonio Sanchez, Manuel Sanchez, Richard Allen
Shank, Ralph Jesus Valdez, Juan Manuel Venagas, Norman Lee
Young, Nelson Jamardo, Defendants-Appellants.
 No. 81-5398.
 United States Court of Appeals,
Eleventh Circuit.
 April 18, 1983.
 
 Stanley Marcus, U.S. Atty., James G. McAdams, III, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.
 Ronald A. Dion, Miami, Fla., John Spottswood, Key West, Fla., for Shank & Jamardo and Blasco, Chambrot, Cruz, Fernandez, Garcia, R. Hernandez, Maldonado, Martinez, Mungin, Novales, A. Sanchez, A. Hernandez, Venegas & Young.
 Nathan E. Eden, Key West, Fla., Bennie Lazzara, Jr., Tampa, Fla., for D. Galvan, S. Galvan, A. Hernandez, Valdez Noatch, F. Hernandez.
 Walter & Keefe and Harold F. Keefe, Coral Gables, Fla., for M. Sanchez and R. Valdez.
 Appeals from the United States District Court for the Southern District of Florida.
 Before KRAVITCH, HATCHETT and CLARK, Circuit Judges.
 KRAVITCH, Circuit Judge:
 
 
 1
 Appellants appeal their convictions of conspiracy to possess marijuana with intent to distribute and possession with intent to distribute, raising a number of grounds for review. After a thorough review of the voluminous record in this case, we find no error, and therefore we AFFIRM.
 
 
 2
 * In October 1980, United States Customs Agent Welch received information from a confidential informant that marijuana off-loading activities were occurring in the area of the Cohen estate on Big Pine Key in the Florida Keys. The Monroe County Sheriff's Department received similar confidential information concerning marijuana smuggling activities. During the following two weeks the area was subjected to periodic surveillance. During the late afternoon of November 14, 1980, Detectives Coletti and Barber of the Monroe County Sheriff's Department established a surveillance point at the Seven Mile Bridge. Barber observed two T-Crafts[1] proceeding south of the bridge. From a point just south of the bridge's drawspan they observed one of the boats as it passed beneath them, and Coletti was able to identify the sole occupant as Bernardo Valiente.[2] The first T-Craft was slightly ahead of Valiente's boat, and both were travelling in a northwesterly direction. After several miles, the boats navigated in different directions, the first toward Rocky Channel and the Gulf of Mexico, and Valiente's toward Big Pine Key. The two detectives maintained a moving surveillance of Valiente's boat. As Coletti reached the north end of the Spanish Harbor Bridge, which connects Spanish Harbor Keys to Big Pine Key, Valiente's T-Craft entered a canal on Big Pine Key, leading to the Cohen property.
 
 
 3
 Detective Coletti was then joined by Agent Welch. Several minutes later, the T-Craft piloted by Valiente emerged at the entrance to the canal. Although Valiente was the sole occupant at the time the boat entered the canal, it contained six or seven people upon its exit. The vessel first headed back toward Marathon, then turned north toward the Gulf of Mexico. Based on these observations, Welch instigated surveillance covering the Cohen estate by officers of both the Monroe County Sheriff's Department and United States Customs.
 
 
 4
 Two officers were stationed at Spanish Harbor Bridge; two others were to patrol the area from No Name Key to Spanish Harbor Key. Welch, Coletti, and Barber secreted themselves in a grove of mangroves near the locked gate on the road leading to the Cohen property. It was already dark by this time, and the weather was bad, raining intermittently.
 
 
 5
 The Cohen estate is bordered by water on two sides--the southern end of the residence rests upon a canal, and the western portion of the property extends to the Spanish Harbor Channel. The remaining two sides are enclosed by a chain-link fence, and, on the night in question, the gate across the road leading to the residence was padlocked.
 
 
 6
 Shortly after the officers positioned themselves, Welch, using a pair of night goggles, observed a man walking toward the gate that led to the property. The man spotted the officers in the bushes and asked who they were. The officers responded that they were "waiting for the others." Fearing that their surveillance was in jeopardy, the officers detained the man and removed him from the area.[3] The officers then resumed their surveillance.
 
 
 7
 After several hours, the officers moved through the trees to the edge of Spanish Harbor Channel, a point from which they could see the entrance to the canal leading to the Cohen property. Agent Welch continued to scan the canal entrance with his battery-powered nightscope. At times during the surveillance, Welch waded out into the water to get a better vantage point. At approximately 2:00 a.m. the officers heard a boat motor and determined that the sound was emanating from the canal at a point close to the Cohen house. After the engine noise ceased, Welch heard numerous "thuds, a hollow thudding." Roughly fifteen minutes later Welch heard the sound of another boat engine and waded out into the channel. Using his nightscope he discerned the outline of a boat approaching the canal that leads to the Cohen property. The thudding started again, and the officers returned to their original surveillance point on the road near the gate.
 
 
 8
 Welch left Coletti and Barber and walked across U.S. Highway 1 to a rock quarry where his supervisor, Major Seals, was maintaining surveillance. Welch informed Seals of what he had observed and of his belief that this was a marijuana off-loading operation. The decision was made to enter the Cohen property. Seals and Welch waited at the rock quarry for other officers who were then instructed to shut off the possible avenues of escape. Welch, Seals, Patrolman Leonard, and Detective Allen returned to where Coletti and Barber were waiting, and at about 3:30 a.m., the officers climbed over the chain-link fence and walked down the dirt road leading to the Cohen house. Observing a white van parked along the road, to avoid detection, they continued through the mangroves. Exiting at a point approximately fifty feet from the house, the officers could smell the pungent aroma of marijuana despite the heavy rain.
 
 
 9
 The six law enforcement officers were gathered together when they saw three men exit from a door to the left of the main garage door. When the three individuals were within ten feet of the officers Agent Welch identified himself and announced that all three were under arrest. Commotion ensued as the three men fled in different directions. Welch wrestled one to the ground[4] while Seals and Leonard apprehended the remaining two suspects.[5]
 
 
 10
 Seals and Coletti then proceeded to the rear of the house. They could hear sounds of movement and through the windows could see people moving about. The officers announced their official presence and entered the house, arresting those inside.[6] At about the same time, Agent Welch rounded the corner of the house with one suspect in tow when he came upon an individual sitting on a rock wall near the garage door. Welch immediately placed this suspect, who did not resist, under arrest.[7] In the garage, Welch discovered a broken bale of marijuana and several book-sized packages of the contraband.
 
 
 11
 Next to the east wall of the house was a large delivery truck under which Leonard apprehended a hiding suspect.[8] After taking this suspect into the house, Leonard returned to the truck and arrested a second individual entangled in the bushes next to the truck.[9] The agents later discovered that the truck was loaded with marijuana bales.
 
 
 12
 At the time Welch first announced his presence to the three men who exited the building, Detective Barber saw another man running from the house in the direction of Spanish Harbor Channel. Barber gave chase for about 100 yards, and as the man entered the woods, Barber fired two warning shots. The man tripped and was apprehended.[10]
 
 
 13
 As Barber returned to the house he heard the sound of an approaching boat. Barber and other agents went out to the dock and stood there hiding their faces. As the bow lines of the twin-engine T-Craft were handed to the agents, the four men aboard were arrested.[11] The T-Craft was loaded with eighty-three bales of marijuana. The suspects were handcuffed and taken to the living room where the other suspects were sitting on the floor.
 
 
 14
 While in the process of securing the premises, Agent Welch heard something move above him. In the garage bathroom, Welch and Seals discovered the entrance to an attic crawl-space. Welch announced his presence as a customs officer and that all those hiding within were under arrest. Although the testimony is a bit confused, the evidence showed that five men were arrested as they emerged from the crawl-space.[12]
 
 
 15
 In all, twenty-three defendants in this case were arrested on the Cohen premises or as they stepped off the loaded T-Craft that docked there. Four other defendants were arrested during the early morning hours of the 15th on a single-engine T-Craft that was stopped for proceeding without running lights by Florida patrolmen.[13] These four defendants were taken to the Cohen property because the officers suspected that they were involved with the off-load operation. Later, at about 6:30 a.m., the final two defendants were arrested aboard the "Miss Lucy," a lobster-crawfishing boat, as it idled in the Spanish Harbor Channel.[14] These two men were also taken back to the Cohen house.
 
 
 16
 All the defendants were detained in the living room and kitchen of the residence before they were transported to the Sheriff's office in Key West for processing. Evidence at trial showed that the floors of the house were covered with marijuana residue that might have been tracked in by the officers and the suspects. Besides the partial bale found in the garage, the officers found no marijuana in the house itself.[15] Including the eighty-three bales removed from the loaded T-Craft, approximately 31,000 pounds of marijuana were seized on the Cohen premises.
 
 
 17
 A two-count indictment was returned against the twenty-nine defendants, charging each with conspiracy to possess with intent to distribute in excess of 1,000 pounds of marijuana in violation of 21 U.S.C. Sec. 846[16] and possession with intent to distribute approximately 31,000 pounds of marijuana in violation of 18 U.S.C. Sec. 2[17] and 21 U.S.C. Sec. 841(a)(1).[18]
 
 
 18
 Defendants filed a joint motion to suppress all physical evidence gathered by the officers and any statements made by defendants. The magistrate found that the twenty-three defendants at the Cohen estate did not have standing to raise a fourth amendment challenge. He alternatively found that, even assuming that these defendants had standing, the warrantless entry was justified. Therefore, with regard to the twenty-three defendants arrested at the Cohen estate, the magistrate recommended that the motion to suppress be denied. He did, however, recommend that the evidence seized from the defendants aboard the single-engine T-Craft and from the two defendants aboard the "Miss Lucy" be suppressed. The trial court agreed that the evidence confiscated at the Cohen estate should be admitted and that the evidence seized aboard the single-engine T-Craft be excluded. The court deferred an ultimate ruling on the magistrate's recommendation that the evidence found aboard the "Miss Lucy" be suppressed. He therefore denied the defendants' motion to suppress with regard to the "Miss Lucy," but did so without prejudice.[19]
 
 
 19
 After a four-week trial, twenty-two of the twenty-nine defendants were found guilty on both counts.[20] The trial judge granted a directed verdict of acquittal to the two defendants who were arrested aboard the "Miss Lucy," and the four defendants who were arrested aboard the single-engine T-Craft by the Florida patrolmen were acquitted by the jury.
 
 
 20
 Appellants raise four main challenges to their convictions. Two concern the denial of their joint motion to suppress;[21] two relate to the conduct of the trial. First, appellants contend that the magistrate erred in concluding that appellants lacked any legitimate and reasonable expectation of privacy that would implicate fourth amendment concerns. Second, appellants attack the magistrate's alternate conclusion that the warrantless entry of the Cohen estate was justified. Appellants' third contention is that the government was guilty of intentional misconduct that deprived appellants of a fair trial and due process of law. Finally, appellants urge that the evidence adduced at trial was insufficient to support their convictions.
 
 II
 
 21
 At the conclusion of the suppression hearing the magistrate found that the appellants lacked standing to challenge the warrantless entry of the Cohen property. Alternatively, he found that the warrantless entry was justified under the circumstances. Because the standing issue is not determinative, we assume, without deciding, that the appellants who were arrested at the Cohen estate have standing to raise a fourth amendment challenge. Hence, we address the propriety of the contested search and seizure.
 
 
 22
 The fourth amendment contemplates that, to authorize entry upon private property, a detached and neutral magistrate will consider the sworn affidavits of law enforcement officials supporting a claim that criminal activity is afoot. With a detached perspective, the magistrate is then able to render a dispassionate decision concerning the presence of probable cause. Where probable cause exists, society's interest in thwarting criminal activity outweighs the individual's privacy interest. Our Founding Fathers had the prescience to realize that law enforcement officers in their zealous efforts to do their jobs cannot always undertake the detached and neutral reflection embodied in the fourth amendment's warrant clause. Therefore, the insistence upon a neutral decisionmaker is mandated. The Supreme Court, however, has recognized that circumstances sometimes preclude the preferred route of obtaining a warrant, and consequently, has allowed warrantless searches and seizures of a residence where both probable cause and exigent circumstances exist. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("stop and frisk"--frisk of suspicious individual on street upheld); Warden v. Hayden, 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967) ("hot pursuit"--warrantless entry and search of residence upheld where police were told that robbery suspect had entered only five minutes earlier); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (original "automobile exception"--warrantless stop and search of vehicle upheld because of inherent mobility); see also Vale v. Louisiana, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970) (warrantless search of house unjustified where exceptional circumstances not present).
 
 
 23
 Probable cause to arrest exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed. United States v. Perez, 526 F.2d 859 (5th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976).[22] "A search, on the other hand, requires probable cause that the search will uncover evidence of a crime." United States v. Rojas, 671 F.2d 159, 165 (5th Cir.1982) (Unit B). Probable cause to search exists where the facts warrant a reasonably cautious person to believe that objects sought in connection with a crime will be found. United States v. Green, 634 F.2d 222, 225 (5th Cir.1981). See United States v. Melvin, 596 F.2d 492 (1st Cir.), cert. denied, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979) (even if police do not have probable cause to arrest, property may be searched upon probable cause to believe that evidence of the crime may be found). See generally 1 W. LaFave, Search and Seizure Sec. 3.1(b) (1978).
 
 
 24
 Here, there is no question that the agents based upon their knowledge of the modus operandi of drug smuggling had probable cause to believe that a marijuana off-loading operation was taking place. While the two independent tips were not alone sufficient to constitute probable cause of criminal activity, they must be combined with the information derived from the surveillance of the Cohen property and the general area. The Cohen estate was in a secluded and isolated area. An open fishing boat with six or seven men was seen leaving the canal and heading out to open sea on a day when the weather was poor. The agents later confronted a suspected lookout who became visibly upset upon encountering the officials at the gate guarding the entrance to the residence. After midnight, agents heard two boats approach the property and at least two dozen thudding sounds that sounded like marijuana bales being off-loaded. These collective facts would lead a reasonably cautious person to believe that a crime had been or was being committed. Thus, probable cause for the entry onto the Cohen property and the subsequent arrests of its occupants was present.
 
 
 25
 Probable cause, without more, would be insufficient to justify the warrantless entry onto the Cohen property. What the government must demonstrate is that the exigencies of the situation prevented the agents from securing a search warrant from a magistrate. The exigent circumstances exception to the fourth amendment warrant requirement applies in "those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." Arkansas v. Sanders, 442 U.S. 753, 759, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235, 242 (1979). "The doctrine applies equally to warrantless seizures of persons or property because both acts implicate the same privacy interests and deserve the same level of constitutional protection." United States v. Kreimes, 649 F.2d 1185, 1192 (5th Cir.1981).
 
 
 26
 Courts have catalogued several situations in which exigent circumstances exist, but it is clear that the exception must be applied carefully to each factual scenario. Exigent circumstances that have been recognized include: danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and "hot pursuit" of a fleeing suspect. Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) (no exigent circumstances present to justify search of house for contraband where defendant was arrested on front steps); Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968) ("stop and frisk" of suspicious individual on street permitted to ensure officer's safety); Warden v. Hayden, 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967) (warrantless entry and search of residence upheld where officers were in "hot pursuit" of armed robbery suspect); United States v. Kreimes, 649 F.2d 1185 (5th Cir.1981) ("hot pursuit" exception); United States v. Rubin, 474 F.2d 262 (3d Cir.), cert. denied, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973) (risk of removal or destruction of narcotics from statute justified warrantless entry and search). See 2 W. LaFave, Search and Seizure Sec. 6.5 (1978). Because the protections of the fourth amendment are crucial to a free and viable society, the government shoulders a heavy burden of justifying the failure to obtain a warrant prior to the intrusion. United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951).
 
 
 27
 Here, probable cause did not arise until the officers heard the boats and the thudding sounds of marijuana being off-loaded. Prior to that point, only a reasonable suspicion of criminal activity existed. We do not fault the agents for failing to repair to a magistrate several miles away at 2:00 a.m. when they heard the sounds of an off-load operation in process. Cf. United States v. Gardner, 553 F.2d 946 (5th Cir.1977), cert. denied, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978) (failure to try to obtain search warrant at earliest practical moment does not end inquiry). The inherent mobility of the boats that the officers heard and the impossibility of controlling traffic in the canal and the Spanish Harbor Channel compel us to conclude that exigent circumstances to proceed without a warrant existed in this case. There was an imminent danger of flight or escape by the individuals involved. We emphasize that our decision is premised on the mobility of the boats. The danger that the marijuana itself would have been removed without detection is remote because the agents could have easily blocked the road.
 
 
 28
 Once on the property, the agents encountered the overwhelming smell of marijuana and were justified in seizing the marijuana in the open truck under the plain view doctrine. See Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The danger to the officers presented by the fleeing suspects justified an exploratory search of the residence and the remaining vehicles to assure that no one lay in waiting for the agents. See United States v. Mesa, 660 F.2d 1070 (5th Cir.1981).
 
 
 29
 Having determined that probable cause and exigent circumstances existed to justify the warrantless entry and search of the Cohen property, we hold that the magistrate correctly denied appellants' joint motion to suppress the evidence seized from the Cohen property, albeit for different reasons.
 
 III
 
 30
 Appellants next contend that the trial court erred in not declaring a mistrial for numerous instances of prosecutorial misconduct. The alleged violations include infractions of the court's standing discovery order, the sequestration rule, failure to comply with Brady requests, and a violation of the attorney-client privilege. We address these contentions independently and as a collective whole to determine if the conduct was so prejudicial as to deprive appellants of their due process right to a fair trial.
 
 
 31
 At both the suppression hearing and the trial, Assistant United States Attorney Leah Simms violated the court's sequestration rule. In both instances, her attitude and lack of respect for the court's authority can best be characterized as contemptuous. During an overnight recess in the suppression hearing, she met with Agent Welch and Major Seals, who were both under the rule not to discuss the case with the attorneys since the hearing was to continue the next morning. Simms, when given the opportunity to explain her conduct to the magistrate, plead necessity, but unwisely informed the court that she would violate the rule again if the circumstances were similar. And that she did. At a recess in the trial itself, Simms was observed having a conversation with Major Seals who, technically, was still on the witness stand.[23] Major Seals had overheard defense counsel discussing trial strategy with some of the defendants, and he informed Simms of the content of that conversation. Simms did not volunteer this information to the trial judge before being confronted with it. Instead, while Major Seals was testifying, she gestured to a novel that she had been reading as if to prompt Major Seals to testify that the novel was the only topic of their conversation. The trial judge was astonished that an Assistant United States Attorney was gesturing to a witness, and so are we.[24] Such behavior not only is unprofessional but reflects negatively upon the integrity of the judicial process.
 
 
 32
 A third violation of the rule occurred between Agent Welch and Major Seals concerning the arrest of Francisco Paco Novales. Welch testified that Novales was the fifth man found in the attic crawl-space, and afterwards, told Seals that he had so testified. The rule of sequestration prohibits witnesses from conversing with one another during the entire course of the trial. The colloquy between the officers was not only a serious mistake of judgment by the agents, but a clear violation of the rule.
 
 
 33
 When infractions of this kind occur, a court has three possible sanctions. First, the guilty party, be it a witness, a party to the action, or counsel, may be cited for contempt. Holder v. United States, 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010 (1893). Second, the court may allow opposing counsel to cross-examine the witness as to the nature of the violation. Cf. Geders v. United States, 425 U.S. 80, 89, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592, 600 (1976). Here, the magistrate and the trial judge held a hearing on each of the violations. Third, where the defendants have suffered actual prejudice, and there has been connivance by the witness or counsel to violate the rule, the court may strike testimony already given or disallow further testimony. United States v. Bobo, 586 F.2d 355, 366 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979); Braswell v. Wainwright, 463 F.2d 1148, 1152-57 (5th Cir.1972). At the suppression hearing, the magistrate barred further testimony from Agent Welch and Major Seals because the two prerequisites for this serious sanction were present. The trial judge did not disallow testimony already given concerning the arrest of Mr. Novales, but we find no abuse of discretion in this decision. United States v. Walker, 613 F.2d 1349, 1355 n. 11 (5th Cir.), cert. denied, 446 U.S. 944, 100 S.Ct. 2172, 64 L.Ed.2d 800 (1980). Viewing the sequestration violations individually, we cannot say that the appellants were so prejudiced that a mistrial should have been granted.
 
 
 34
 Appellants next contend the government failed to comply with their pre-trial Brady requests and the court's standing discovery order. Appellants cite the following transgressions among others: the introduction of the FBI fiber report, which was exculpatory, six days into the trial after defendants had clearly requested the results of the test; Major Seals' testimony that a nightscope had been found in a van--the nightscope not having appeared on exhibit list as required by the court's standing discovery order; failure to provide defense counsel with copies of Detective Coletti's amended investigation report; failure to produce a .45-calibre pistol in discovery; undisclosed Brady material concerning the firing of jailer Geike; testimony of appellants' statements that were barred under agreement; and failure to produce a one-pound bag of marijuana that allegedly was found in the kitchen of the Cohen residence.
 
 
 35
 To establish a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the appellants must demonstrate (1) that the prosecution suppressed evidence (2) that was favorable to the appellants or exculpatory and (3) that the evidence was material. Ogle v. Estelle, 641 F.2d 1122 (5th Cir.1981). Materiality turns on the specific circumstances surrounding the alleged Brady violation. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1975). If the defense makes a specific request for material that is suppressed the standard of materiality is whether the suppressed evidence might have affected the outcome of the case. Id. at 104, 96 S.Ct. at 2398. If the request is for Brady material in general or if no request is made at all, the test for materiality is whether the suppressed evidence creates a reasonable doubt that did not otherwise exist. Id. at 107-12, 96 S.Ct. at 2399-2401. Where the prosecution has either actual or constructive knowledge that its case is based on false evidence or perjury, suppressed evidence is material if there is any reasonable likelihood that the false evidence could have affected the judgment of the jury. Id. at 103, 96 S.Ct. at 2397. If the suppressed evidence is purely impeaching evidence and no defense request has been made, the suppressed evidence is material only if its introduction probably would have resulted in acquittal. United States v. Anderson, 574 F.2d 1347, 1353 (5th Cir.1978).
 
 
 36
 Approximately six days into the trial, defense counsel were handed copies of an FBI report reflecting that there were no burlap fibers on the clothes of four defendants. Defense counsel protested vociferously that for six days they had been attempting to explain away the supposed presence of the fibers. Although defense counsel had specifically requested the results of this report, the government neglected to produce the report prior to the trial. The suppressed evidence was clearly exculpatory, yet appellants' arguments are misplaced. The fiber analysis was conducted on the clothes of the four defendants who were subsequently acquitted. Therefore, the suppressed evidence was not favorable to the appellants, and their contentions under Brady are without merit. See United States v. Beasley, 576 F.2d 626, 630 (5th Cir.1978), cert. denied, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).
 
 
 37
 Appellants further contend that the government's failure to apprise them that one of the government's witnesses, Geike, who was responsible for collecting the clothing of four of the defendants for fiber analysis, had been discharged from his job as a jailer due to his negligence. Ordinarily, evidence of Geike's subsequent discharge for negligence would have proven very damaging to the government's chain-of-custody evidence; again because this impeaching evidence was favorable only to individuals not before us on appeal, we hold that no Brady violation with regard to these appellants occurred. Additionally, under the standard set forth in United States v. Anderson, 574 F.2d 1347, 1353 (5th Cir.1978), this evidence would not have met the materiality prong of the test.
 
 
 38
 Neither did the failure of the government to provide copies of Detective Coletti's amended investigation report and Officer Sewart's official report prior to their testimony constitute grounds for a mistrial. Production under the Jencks Act need only occur after the testimony of the statement's author. United States v. Campagnuolo, 592 F.2d 852 (5th Cir.1979). Although the trial court had ordered early production of all Jencks material, it was certainly within the court's discretion to allow the material into evidence once the appellants were allowed a reasonable time to prepare cross-examination. We find no abuse of discretion here.
 
 
 39
 Testimony at trial raised the possibility that there was a one-pound bag of marijuana in the kitchen of the Cohen residence. Through inadvertence or negligence, the bag apparently was lost and was not produced as evidence. Appellants contend that the testimony regarding the bag of marijuana prejudiced their rights to confrontation since the bag itself was never produced. The trial judge erred, they assert, in failing to strike the testimony concerning the mystery bag. On appeal, we must decide whether the presence of the bag of marijuana at trial probably would have changed the verdict. United States v. Gordon, 580 F.2d 827 (5th Cir.), cert. denied, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978). We agree with the government that the failure to produce a one-pound bag of marijuana where approximately 31,000 pounds were seized was hardly prejudicial. The trial judge committed no error in allowing the testimony.
 
 
 40
 We now turn to the most troublesome assertion of government misconduct. Appellants contend that their attorney-client privilege was violated when Major Seals informed Simms of the content of an overheard conversation between defense counsel and several of the defendants in the public corridor outside the courtroom in which they discussed the advisability of pursuing a court-ordered mistrial due to the growing number of improprieties committed by the prosecution. Appellants argue that by obtaining the contents of the conversation the government violated their sixth amendment right to counsel.
 
 
 41
 The former Fifth Circuit has held that a communication between an attorney and his client that is protected by the common law attorney-client privilege is also protected from government intrusion by the sixth amendment. United States v. Melvin, 650 F.2d 641, 645 (5th Cir.1981). The Melvin court also stated that the principle of confidentiality is not forfeited in a multiple-defendant case where the attorneys deem it advisable to formulate a joint defense. The freedom from government intrusion that appellants enjoy is defined by the common law privilege:
 
 
 42
 A communication is protected by the attorney-client privilege--and we hold today is protected from government intrusion under the Sixth Amendment--if it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential. Thus, disclosures made in the presence of third parties may not be intended or reasonably expected to remain confidential.
 
 
 43
 Id. (citing McCormick's Handbook of the Law of Evidence Sec. 91 (Edward W. Cleary 2d ed. 1972)).
 
 
 44
 Clearly, the content of the conversation between defense counsel and his clients was intended to be confidential. The circumstances surrounding the communication, however, belie confidentiality. The conversation took place in a public hallway. This, in and of itself, is not fatal to confidentiality if the conversation had been conducted in low voices and if it were clear that outsiders were not present. Here, however, the defense counsel spoke with intonations loud enough for any casual passerby to hear. Moreover, the content of the conversation revealed no confidential information the disclosure of which was prejudicial to appellants' right to a fair trial. We determine, therefore, that no sixth amendment violation occurred that would render it necessary to declare a mistrial.[25]
 
 
 45
 We have considered appellants' other enumerations of misconduct as they appeared in the voluminous trial record, and we conclude that on an individual basis, the trial judge properly handled each situation. We find no reversible error.
 
 
 46
 A piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution. United States v. Labarbera, 581 F.2d 107 (5th Cir.1978). We are mindful as well of our supervisory function in ensuring the fair and effective administration of the judicial process. United States v. Diharce-Estrada, 526 F.2d 637 (5th Cir.1976).
 
 
 47
 While due process of law mandates that a fair trial be provided to the appellants, there is no constitutional right to a perfect trial. United States v. Ragsdale, 438 F.2d 21 (5th Cir.), cert. denied, 403 U.S. 919, 91 S.Ct. 2231, 29 L.Ed.2d 696 (1971). Our review of the record convinces us that the trial judge handled an inherently difficult case in the most professional manner. He took great pains to assure a fair trial for appellants. His curative actions ameliorated any prejudicial effect that the government's conduct otherwise might have occasioned. Viewing the trial as a whole, we believe that appellants were accorded a fair trial.
 
 IV
 
 48
 Appellants finally argue that the government failed to prove its case against each of them individually --that the evidence was insufficient to establish their participation in the conspiracy and their possession of the contraband. It is incumbent upon the prosecution in conspiracy cases to demonstrate each defendant's individual participation in the alleged conspiracy. A defendant may not be convicted unless the evidence adduced at trial is sufficient to demonstrate his own complicity beyond a reasonable doubt. Guilt by association may not attach; the prosecution must individualize its proof as to each alleged conspirator.
 
 
 49
 To establish the existence of a drug conspiracy under 21 U.S.C. Sec. 846, the government must prove that there was an agreement by two or more persons to violate the narcotics laws. United States v. Tamargo, 672 F.2d 887, 889 (11th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982); United States v. Spradlen, 662 F.2d 724, 727 (11th Cir.1981); United States v. Glasgow, 658 F.2d 1036 (5th Cir.1981). The existence of a conspiratorial agreement may be established through either direct or circumstantial evidence, such as "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Spradlen, 662 F.2d 724, 727 (11th Cir.1981). "Proof is not required that the defendant had knowledge of all the details of the conspiracy; the defendant need only have knowledge of the essential objective of the conspiracy." United States v. Tamargo, 672 F.2d 887, 889 (11th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982) (citing United States v. Alvarez, 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), cert. denied, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981)). No showing of an overt act is required in conspiracy cases under 21 U.S.C. Sec. 846. See, e.g., United States v. Davis, 666 F.2d 195, 201 n.9 (5th Cir.1982) (Unit B); United States v. Spradlen, 662 F.2d 724, 727 (11th Cir.1981); United States v. Diaz, 655 F.2d 580, 584 (5th Cir.), cert. denied, 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982); United States v. Marx, 635 F.2d 436 (5th Cir.1981). Thus, as to each alleged conspirator, the prosecution must prove that a conspiracy existed, that the individual had knowledge of at least the essential objectives of that conspiracy, and that armed with that knowledge, he participated.
 
 
 50
 The underlying substantive crime in this case was the possession of marijuana with the intent to distribute. "Conviction on the substantive crime is not prerequisite to culpability on a conspiracy charge. However, if the contemplated crime has been committed by a coconspirator, the other coconspirators, as partners of each other, may be charged as principals in the perpetration of the crime." United States v. Garcia, 655 F.2d 59, 62 (5th Cir.1981) (citing Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); United States v. Sullivan, 578 F.2d 121, 123 (5th Cir.1978)). See United States v. Tamargo, 672 F.2d 887, 890 (11th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982). Possession of contraband may be either actual or constructive. "The hallmark of constructive possession is some measure of dominion and control over the contraband. Dominion and control can either be exclusive or shared." United States v. Maspero, 496 F.2d 1354, 1359 (5th Cir.1974) (mere presence in area of contraband or awareness of its location is insufficient to establish possession).
 
 
 51
 The predecessor of this court recently set forth the standard to be employed in determining the sufficiency of the evidence in a criminal appeal. United States v. Bell, 678 F.2d 547 (5th Cir.1982) (Unit B en banc), cert. granted, --- U.S. ----, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982).[26]It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.
 
 
 52
 Id. at 549 (footnote omitted).
 
 
 53
 "In applying this standard all reasonable inferences and credibility choices must be made in favor of the jury verdict, and that verdict must be sustained if there is substantial evidence to support it when the facts are viewed in the light most favorable to the government." United States v. Davis, 666 F.2d 195, 201 (5th Cir.1982) (Unit B). See Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Henderson, 693 F.2d 1028, 1030 (11th Cir.1982); United States v. Gianni, 678 F.2d 956, 958-59 (11th Cir.1982).
 
 
 54
 We think it clear beyond peradventure that the government proved the existence of a conspiracy and that at least some of the coconspirators actually possessed marijuana with the intent to distribute. Thus, under Garcia, supra, any appellant found to be a member of the conspiracy was properly convicted of the possession count as well. Accordingly, we devote most of our attention to the sufficiency of the evidence on the conspiracy count. For clarity's sake, we divide the appellants according to the location of their arrests.
 
 The Loaded T-Craft
 
 55
 Three appellants, Enrique Blasco, Catalino Chambrot, and Mitchell Noatch, were arrested aboard a T-Craft, which was loaded with eighty-three bales of marijuana, as it docked at the Cohen residence.[27] The boat was so loaded that at least two of the men were standing on the bales. Obviously, this was too much marijuana for even the most voracious of personal habits. Accordingly, the jury was free to inter intent to distribute from the quantity of marijuana confiscated. United States v. Grayson, 625 F.2d 66 (5th Cir.1980). The men exercised dominion and control over the boat and its contents, and thus were in actual possession of the marijuana found on board. A reasonable jury could find that given the circumstances surrounding these appellants' arrest, these men not only were involved in a conspiracy to possess marijuana with the intent to distribute, but actually possessed with intent to distribute. Hence, the evidence was sufficient to warrant conviction on both counts. Accordingly, we affirm as to appellants Blasco, Chambrot, and Noatch. Because these three conspirators had actual possession of marijuana, if any of the other appellants present at the site of operations were properly found to be members of the conspiracy, then the possession convictions as to those appellants must be affirmed.
 
 Hiding and Fleeing Suspects
 
 56
 Several appellants were arrested after they attempted to flee or to hide from the law enforcement officials. Juan Manuel Venagas was wrestled to the ground by Agent Welch after Venagas attempted to flee when the officers announced their presence. Ralph Valdez was arrested by Major Seals as Valdez attempted to flee. Detective Barber chased Domingo Galvan for over a hundred yards before Galvan tripped and fell. Vincente Martinez and Richard Allen Shank were found hiding under and next to a truck loaded with marijuana. Appellants Orlando Maldonado, Richard Mungin, Norman Lee Young, Angel Cruz, and Francisco Paco Novales were arrested by Agent Welch after their presence in the attic crawl-space was discovered. These appellants contend that their presence on the Cohen estate was insufficient to connect them to the drug conspiracy. While mere presence alone is inadequate to link a defendant to a conspiracy, United States v. DeSimone, 660 F.2d 532, 537 (5th Cir.1981), cert. denied, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982), the totality of the circumstances surrounding these appellants' arrest evidences much more than mere presence. Cf. United States v. Tamargo, 672 F.2d 887, 889 (11th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982).
 
 
 57
 The Cohen estate is situated in a secluded area, the kind frequently utilized for off-load operations. The three agents at the gate heard at least two boats entering the canal that leads to the Cohen dock, and after each of the boats entered, the agents heard numerous thudding sounds. If the agents who were over 200 yards away from the residence could hear the noises, it strains the imagination to think that these appellants were not aware of the off-loading taking place on the dock outside the house. The arrests were made in the early hours of the morning, and the aroma of marijuana pervaded the air surrounding the residence. The appellants in and near the house would have been able to smell the bales without difficulty. We think that a reasonably cautious jury could infer from these circumstances that these appellants were involved in a conspiracy to possess and distribute marijuana. As to these appellants, we affirm the convictions on both counts.
 
 In the Living Room and On the Wall
 
 58
 Antonio Sanchez, Jose Garcia, Nelson Jamardo, Nestor Fernandez, Antonio Hernandez, Francisco Avila Hernandez, Sergio Eduardo Galvan, and Raul Hernandez were arrested in the living room of the Cohen residence. Manuel Sanchez was sitting on a rock wall outside the house when he was arrested. The evidence is clear that Sanchez did not attempt to flee, and although there was testimony regarding movement in the house, we will assume that those arrested in the living room were merely standing about when they were arrested by Detective Coletti and Major Seals.
 
 
 59
 Although the evidence against these individuals was not as strong as against the others, nevertheless, viewing the total circumstances recited above in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we conclude that the jury properly could have found beyond a reasonable doubt that these appellants were not present for some innocuous reason, but were a part of the overall and well orchestrated conspiracy to off-load marijuana. The circumstantial evidence adduced at trial was sufficient to convict on both counts. Therefore, we affirm on both counts as to these appellants.
 
 V
 
 60
 Appellants assert other grounds of error,[28] but having reviewed the entire record of this case, we find no merit in their contentions. We AFFIRM.
 
 
 
 [1]
 A T-Craft is an open fisherman with a center console and is approximately 23-feet in length
 
 
 [2]
 Valiente was tried and acquitted of any criminal activity
 
 
 [3]
 This person, later identified as Roland Aguilar, was not indicted
 
 
 [4]
 The individual wrestled to the ground by Agent Welch was Juan Manuel Vanegas
 
 
 [5]
 Ralph Valdez was arrested by Major Seals. The evidence is unclear, but the government contends that Vincente Martinez was the third suspect. See note 8 and accompanying text infra
 
 
 [6]
 The following suspects were arrested inside the house: Antonio Sanchez, Jose Garcia, Nelson Jamardo, Nestor Fernandez, Antonio Hernandez, Francisco Hernandez, and Raul Hernandez
 
 
 [7]
 The suspect sitting on the wall was later identified as Manuel Sanchez
 
 
 [8]
 Vincente Martinez was the suspect who was found under the cab of the truck
 
 
 [9]
 Patrolman Leonard arrested Richard Allen Shank in the bushes next to the truck where Martinez was arrested
 
 
 [10]
 This was Domingo Galvan
 
 
 [11]
 Enrique Blasco, Catalino Chambrot, Carmelo Fernandez, and Mitchell Noatch were arrested on the twin-engine T-Craft that was loaded with 83 bales of marijuana. Defendants Chambrot and Fernandez were observed standing on the bales in front of the boat's center console as the boat docked. Enrique Blasco handed Detective Barber the bow line, and Mitchell Noatch was piloting the T-Craft. Carmelo Fernandez is not an appellant in this case
 
 
 [12]
 As noted in the text, the evidence concerning the identification of those arrested in the attic was at best confused. The evidence clearly showed that Angel Cruz, Richard Mungin, Norman Lee Young, and Orlando Maldonado were arrested by Agent Welch as they emerged from the crawl-space. The controversy in the evidence centers upon Francisco Paco Novales, who allegedly was the fifth person arrested in the attic
 
 
 [13]
 Gregorio Collazo, Michael Patrick O'Brien, Ferman Tapia, and Bernardo Valiente were arrested aboard the single-engine T-Craft that was stopped near Sunshine Key. These men were tried with the other 25 defendants and were acquitted
 
 
 [14]
 Ed Ronan and Raphael Lopez were arrested aboard the "Miss Lucy." Both were granted a directed verdict of acquittal by the trial court
 
 
 [15]
 There was some discussion in the record of a bag of marijuana that was allegedly found on the kitchen table or counter, and one of the government's exhibits shows what appears to be a bag of marijuana lying on a table next to an open camera case. Because the government either misplaced or never confiscated the mystery bag, it was not produced as evidence
 
 
 [16]
 21 U.S.C. Sec. 846 provides:
 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
 
 
 [17]
 18 U.S.C. Sec. 2 provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 
 
 [18]
 21 U.S.C. Sec. 841(a) provides:
 Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--
 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
 (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.
 
 
 [19]
 No statements of the defendants were introduced at trial due to an agreement between Miss Simms, the original government prosecutor, and the nine defense counsel. Although evidence regarding the "Miss Lucy" was originally allowed to be presented the trial judge instructed the jury to disregard it after the two defendants who were arrested aboard the "Miss Lucy" were granted directed verdicts of acquittal
 
 
 [20]
 The charges against Carmelo Fernandez, one of the original 29 defendants, were severed from the trial of the other defendants. Therefore, we do not address Mr. Fernandez's case
 
 
 [21]
 The magistrate recommended that the evidence seized from the defendants arrested aboard the single-engine T-Craft and the "Miss Lucy" be suppressed. The trial judge, however, admitted some of the evidence taken from these defendants, but because they were acquitted of any wrongdoing we need not concern ourselves with whether the investigatory stops of the single-engine T-Craft or the "Miss Lucy" were constitutionally valid
 
 
 [22]
 Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding upon this court unless and until they are overruled by the Eleventh Circuit sitting en banc. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc)
 
 
 [23]
 We note the government's assertion that conversation between government counsel and a designated representative during a recess in the latter's testimony is not prohibited by the sequestration rule. We need not reach that issue, but we do note that the conversation between Simms and Major Seals concerning overheard defense strategy would not be covered by any such exception to the sequestration rule. There may well be legitimate reasons for the government's representative and counsel to hold discussions during a break in the representative's testimony, but the discussion of defense strategies that have been overheard is not one of them
 
 
 [24]
 Although the judge banished Simms temporarily from the courtroom for her conduct, we suggest that a citation for contempt would have been more appropriate
 
 
 [25]
 Our determination, however, should not be read as intimating in any way approval of either Seals' or Simms' conduct. Seals should have walked away as soon as he realized the nature of the conversation he was overhearing. Nor should have he approached Simms with the information. Simms, as an officer of the court, should have made a full disclosure of the incident to the trial judge
 
 
 [26]
 Decisions of Unit B of the former Fifth Circuit are binding upon this court. Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir.1982)
 
 
 [27]
 A fourth person, later identified as Carmelo Fernandez, was arrested aboard the T-Craft with the other three. Fernandez is not involved in this appeal
 
 
 [28]
 Appellants contend that the trial court improperly denied their requests for a hearing pursuant to Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), to determine whether the photo sheet used by the officers who testified at trial amounted to an impermissibly suggestive photographic showup. Even with the photographs, the officers made several mistakes when attempting to identify individual defendants
 The trial court ruled that the use of the photo sheet was not impermissibly suggestive and that therefore the issues of misidentification and suggestibility could be brought to the jury's attention through the traditional manner of attacking the witnesses' credibility. Allen v. Estelle, 568 F.2d 1108, 1112 n. 6 (5th Cir.1978). We find no error here, because we agree with the trial court that the use of the photo sheet was not impermissibly suggestive.
 At oral argument, counsel for appellants relied on the non-unanimous jury verdict to support the contention that the evidence was insufficient to support the conviction. Counsel subsequently filed a Notice of Supplemental Authority purporting to raise for the first time the issue whether a defendant may waive his right to a unanimous jury verdict in a federal criminal trial. Having failed to raise this issue in their briefs or at oral argument, the appellants abandoned this ground of appeal. Harris v. Plastics Manufacturing Co., 617 F.2d 438 (5th Cir.1980); United States v. Lynn, 608 F.2d 132 (5th Cir.1979).