## UNITED STATES of America, Plaintiff-Appellee,

v.

## Anthony BAIN, Nelson Davis, Defendants-Appellants.

### No. 82–6008.

United States Court of Appeals, Eleventh Circuit.

July 24, 1984.

Kenneth E. Cohen, Glenn Feldman, Asst. Federal Public Defenders, Miami, Fla., for Bain.

John D. O'Donnell, Panza & O'Donnell, Fort Lauderdale, Fla., for Davis.

Linda Collins Hertz, David O. Leiwant, Asst. U.S. Attys., Stanley Marcus, U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT and CLARK, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designa-

GOLDBERG, Senior Circuit Judge:

This is a criminal case involving the importation of methaqualone tablets (quaaludes) aboard a fishing vessel. Two crewmen challenge their convictions on the grounds that the evidence was insufficient. One of the defendants also argues that evidence of the pills should have been suppressed as the fruit of an illegal search. Finally, he argues that the judge should have granted a mistrial because a government witness made a prejudicial remark. We reject all three arguments and affirm the convictions.

## FACTS

On the evening of May 19, 1982, the Princess Dean II, a 53-foot lobster vessel, lay docked at the Miamarina in Miami, Florida. On board were Marcus Dean (the captain), his wife Maralyn, Tony Bain, and Nelson Davis. Bain and Davis were crewmen.

In the early evening, a supervisor at Customs Patrol headquarters in Miami received a telephone call from a confidential informant reporting suspicious activity aboard the Princess Dean II. The supervisor dispatched Customs Patrol Officers Leslie Leon and Joseph Alaimo to investigate. They arrived at the marina and found the vessel in the general area described by the informant. The officers approached the vessel and knocked on its side. Receiving no response, they moved to the cabin door and knocked again.

A man wearing only underwear and later identified as Tony Bain opened the door. The officers identified themselves and asked if Bain was the captain of the ship. He responded that he was not, but that the captain was below deck. The officers then requested Bain to bring the captain forward. They waited outside the door until Marcus Dean appeared. The officers again identified themselves, and the captain invited them inside. He told them that the

tion.

vessel had arrived in Miami earlier that morning carrying fish from the Bahamas. He also said that he, his wife and his crewmen were Bahamian.

The officers asked Dean for the ship's customs documents. He replied that they were not on board; the ship's agent had all of the papers.[1] The officers informed him that the law required him to have the documents present. Moreover, they could not verify his account immediately because the Customs Clearance Office was closed for the evening.

The officers thought that the circumstances were suspicious. They thought it was strange for the captain not to have customs documents on board. In addition, the cabin was unusually plush for a commercial fishing boat. It was furnished like a pleasure yacht.

The officers asked Bain to go below deck and bring Mrs. Dean and Nelson Davis back up to the cabin. Bain went below, but he did not return for four to five minutes. Nor did Davis or Mrs. Dean come above deck. From a vantage point in the main cabin, Officer Leon could look down the stairway and follow Bain's movements. Bain moved back and forth between the same cabins several times. Leon became concerned that the crewmen were collecting weapons or destroying evidence. Leon went below deck to investigate.

He met Nelson Davis in the hallway and asked him to go above deck. Leon then went into the master bedroom. There he found Tony Bain. Leon asked Bain to dress and go upstairs. Bain complied and went into a small bedroom next to the master bedroom in order to dress.

Leon also found Maralyn Dean in the master bedroom. He identified himself and asked her to go upstairs. She immediately turned around, went over to a night stand, picked up a small case, and put it inside her purse. She appeared nervous as she left to go above deck.

Leon followed her upstairs and reported what he had seen to Officer Alaimo. Leon mentioned Mrs. Dean's nervousness and her suspicious actions with the purse. He asked Officer Alaimo to check the hidden case. Leon then went back downstairs to the small bedroom where Bain was putting on a pair of pants. Leon opened a cabinet and discovered what appeared to be marijuana residue.

Meanwhile, Alaimo remained in the main cabin above deck. He asked to see Mrs. Dean's purse. She removed the small case before handing him the purse. Alaimo then asked to see the case. Inside was a plastic bag containing 42 tablets which he believed to be quaaludes.[2]

When Officer Leon came back above deck, Alaimo told him about the pills. Leon, in turn, said that he had found marijuana residue in the cabin where Bain was dressing. Based on these discoveries, the officers detained all four defendants and read them their *Miranda* rights. Leon then called his supervisor and requested his presence on the Princess Dean II. Leon remained in the galley with the defendants while Officer Alaimo searched the vessel.

Alaimo opened an anchor rope locker in the cabin where Bain had dressed. Hidden under a rope were nine plastic bags containing 44,500 quaaludes (about 57 pounds). The locker was within arm's reach of the bunks of Bain and Davis.[3] An anchor rope could be pulled out the top of the locker through a hole in the deck; but the main door to the locker opened into Bain and Nelson's cabin. There was no lock on the door; and Officer Alaimo had free access to the quaaludes.

It had taken Alaimo only ten minutes to find the pills. He returned to the galley to

---

1. Subsequent investigations in this case revealed that the ship had cleared customs during the morning, and that the ship's agent, Denise Zitz, had a copy of the documents. *See infra* 736 F.2d at 1484.

2. Subsequent tests at the police lab showed that the pills were indeed quaaludes.

3. Mike Roberts (a passenger who had left the vessel a few hours before the officers arrived) also slept in the cabin.

tell his partner about the find. Their supervisor had also come aboard the vessel by then. All defendants were placed under arrest.

As the evening air was becoming cooler, the officers permitted the defendants to change into warmer clothing. Officer Alaimo escorted Nelson Davis to the crewmen's cabin. Alaimo asked Davis if there were any more contraband on board the vessel. Davis replied: "You don't have to break any flooring or anything like that. You don't have to destroy the vessel in your search." [4]

In a further search of the vessel, Alaimo discovered a black address book in the cabin where Bain and Davis slept and dressed. The inside front cover of the book bore the name and address of Marcus Dean. Two facing pages in the book contained several notations. On one side were the names "Nelson," "Mike," and "Tony," each name followed by several dollar amounts. On the opposite page was a chart with the notation "30,000 Ludes." The word "Ludes" was partially scratched out. Below that appeared the notation "60 short Kept 40 for sample." The next entry read "Sold 900 [at] 55¢ [=] $495.00"; and the final line read "174 lbs [at] 165.00 [=] 28,710.00.[5]

After the second search, appellants Bain and Davis, along with Marcus and Maralyn Dean, were transported to the Customs Office. The Princess Dean II was taken to Customs headquarters and thoroughly searched by Customs officers. They found two more bags of quaaludes under the bed in the Deans' master bedroom. The bags contained an additional 25,280 tablets (about 42 pounds).

Subsequent investigations revealed that the ship's agent, Denise Zitz, along with three government officials,[6] had boarded the Princess Dean II to fill out customs forms on the morning of May 19, 1982, the day that the appellants were arrested. The visit by Zitz came several hours before Officers Alaimo and Leon boarded the vessel, but the officers did not know about the earlier inspection. Although the customs documents were not on board ship when Alaimo and Leon arrived, Zitz had copies. The documents showed that the Princess Dean II was a Bahamian vessel, that Marcus Dean was the master, and that Tony Bain and Nelson Davis were crewmembers. The documents listed Maralyn Cartwright [Dean] and Michael Roberts as passengers. Roberts had left the vessel by the time Officers Alaimo and Leon arrived.

Mr. and Mrs. Dean, Tony Bain, and Nelson Davis were indicted in the United States District Court for the Southern District of Florida. The indictment against each defendant contained two counts: (1) conspiracy to possess with intent to distribute methaqualone, a Schedule II controlled substance, in violation of 21 U.S.C. § 955c; and (2) possession with intent to distribute methaqualone, in violation of 21 U.S.C. § 955a(c) and 18 U.S.C. § 2. Michael Roberts was not indicted, apparently because he had escaped to the Bahamas, outside the jurisdiction of the United States.[7]

The defendants were tried together before a jury; all four defendants were found guilty on all counts. Marcus and Maralyn Dean did not appear for sentencing and are presently fugitives. Tony Bain and Nelson Davis were each sentenced to concurrent terms of imprisonment for two years. They subsequently brought this appeal.

## DISCUSSION

### I. Sufficiency of the Evidence

Bain and Davis take the position that the evidence was insufficient to support their

---

4. Trial Transcript at 58.

5. The left page contained the notations:

| Nelson | $50. | $60. | $150. |
| Mike | $175 | $40 | $300 |
| Tony | $50. | | |

The right page contained the notations:

| 30,000 . | Ludes | | |
| (1,000) | " | 60 short Kept 40 for sample | |
| (ED ) | | Sold 900 [at] 55¢ $495.00 | |
| 174 lbs [at] 165.00 | | 28,710.00 ED | |

6. Immigration, Customs, and Agricultural officials boarded the vessel with Ms. Zitz.

7. His deposition testimony was admitted at trial, however.

convictions for conspiracy and possession. They claim that they were innocent crewmen on board the Princess Dean II. They believed that the vessel was merely carrying conch and other fish to the United States. They had no reason to go into the rope locker because the anchor rope could be let in and out of the locker through a hole on deck; therefore, they did not know of the contraband. In support of their story, the defendants point to the testimony of Michael Roberts taken during a deposition in the Bahamas. Roberts stated that he had hidden the quaaludes on board the Princess Dean II and that none of the defendants knew about the drugs.

■ In reviewing the sufficiency of evidence to support a guilty verdict, we must view the evidence in the light most favorable to the government. *Hamling v. United States*, 418 U.S. 87, 121, 124, 94 S.Ct. 2887, 2909, 2911, 41 L.Ed.2d 590 (1974). *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). All reasonable inferences must be drawn in favor of supporting the verdict. *United States v. Ceballos*, 706 F.2d 1198, 1202 (11th Cir.1983).

■ Applying that standard, we hold first that the jury was entitled to reject entirely the deposition testimony of Michael Roberts. The jury could conclude that his testimony, given from the sanctuary of a Bahamian retreat, was inherently suspect. Credibility choices in deciding which version of a story to believe are a matter for the jury. *United States v. Branca*, 677 F.2d 59, 61 (11th Cir.1982). We find no reason in this case to overturn the jury's decision to reject Roberts' testimony.

■ We turn, then, to the affirmative proof of the crimes. To support a conviction of conspiracy, the government must prove that an agreement existed between two or more persons to commit a crime and that the defendant knowingly and voluntarily joined in or participated in the conspiracy. *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983). Close association with a co-conspirator or mere presence at the scene of the crime is insufficient evidence of knowing participation in a conspiracy. *Id.* Presence is, however, a material and probative factor which the jury may consider in reaching its decision. *United States v. Kincade*, 714 F.2d 1064, 1065 (11th Cir.1983). Furthermore, direct evidence of the elements of a conspiracy is not required. A defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy. *United States v. Vera, supra,* 701 F.2d at 1357.

■ In a number of cases, this Court has considered the sufficiency of evidence to convict crewmen of a drug conspiracy. We have held that the evidence is sufficient when there is a close relationship between captain and crew, and the crewmen are aware of the large quantity of drugs on board ship. *See United States v. Mazyak,* 650 F.2d 788, 791 n. 2 (5th Cir.1981); *see also United States v. Ceballos, supra,* 706 F.2d at 1202; *United States v. Freeman,* 660 F.2d 1030, 1035 (5th Cir. Unit B, 1981); *United States v. DeWeese,* 632 F.2d 1267, 1273 (5th Cir.1980); *United States v. Alfrey,* 620 F.2d 551, 555 (5th Cir.1980).[8] In the present case, the jury could infer that there was a close relationship between Captain Dean and the crew. The vessel was small, and the few people on board were forced to share tight quarters. *See United States v. Ceballos, supra,* 706 F.2d at 1202 (close relationship can be inferred from length of voyage and size of the vessel). Bain walked freely through the vessel wearing only underwear. Moreover, the crew shared profits with the captain [9], from

---

8. Typically, the crew's knowledge of the contraband is inferred from the fact that they have sailed for several days aboard a small vessel, and the contraband is so bulky or odoriferous that it could not escape notice. *See United*

*States v. Ceballos, supra; United States v. Mazyak, supra; United States v. DeWeese, supra.*

9. *See* Trial Transcript at 258.

which the jury could infer the trust and friendship implicit in a shared business venture.

In addition, the evidence supports an inference that Bain and Davis knew that large quantities of quaaludes were on board. First the contraband was not hidden just anywhere in the vessel. Fifty-seven pounds of quaaludes were found in an unlocked locker in the appellants' own small cabin. The locker was within arm's reach of their bunks. Even though it was an anchor rope locker, accessible from above, a reasonable jury could have concluded that the defendants would have opened the locker, given the tightness of their quarters and the need for space during a voyage of several days.

Further, the address book discovered in the same cabin could have led a reasonable jury to conclude that Bain and Davis shared in proceeds from the sale of quaaludes. The names Tony, Mike and Nelson appeared in the book followed by dollar amounts. The jury could reasonably have found that the names referred to the very inhabitants of that cabin: Tony Bain, Mike Roberts, and Nelson Davis. Since Mike was admittedly not a member of the conch fishing crew, the jury could infer that the dollar figures did not represent proceeds from conch sales.[10] A reasonable conclusion was that the figures represented profits from the "Ludes" described on the facing page. Moreover, a reasonable jury could tie those notations to the actual quaaludes involved in this case. The book mentions that 40 pills were "Kept for sample," almost exactly the amount found in a separate case in Mrs. Dean's purse. While the government never proved who made the notations in the book, the jury could find that it belonged to Captain Bain (whose name and address appear on the front cover) and that the notations were made by one of the conspirators.

■ In sum, the totality of the evidence in this case is sufficient to support the conspiracy convictions. *See United States v. Blasco*, 702 F.2d 1315, 1332 (11th Cir. 1983). The small size of vessel, the close relationship between captain and crew, the large quantity of pills in a locker in the appellants' cabin, and the existence of a notebook showing their proceeds from the sale of quaaludes—all of these facts taken together could lead a reasonable jury to conclude beyond a reasonable doubt that Bain and Davis knew of and participated in the conspiracy. *See United States v. Vera, supra*, 701 F.2d at 1357.[11]

■ These facts also support their convictions for possession of methaqualone with intent to distribute. The elements of the crime are: (1) knowing (2) possession of a controlled substance (3) with intent to distribute. *United States v. Vera, supra*, 701 F.2d at 1357.

■ The intent to distribute can be inferred from the large number of quaaludes in the Princess Dean II. *See United States v. Tamargo*, 672 F.2d 887, 900 (2,000 quaalude tablets enough to show intent to distribute). The main question is whether the defendants knowingly possessed the drugs. Possession may be actual or constructive, and may be proved by circumstantial as well as direct evidence. *Id.; United States v. Bustos-Guzman*, 685 F.2d 1278, 1280 (11th Cir.1982). The hallmark

---

10. The appellants build their defense on the theory that they shipped aboard to help transport conch for sale at the Flamingo Fisheries. The government has never disputed that such sales were made. A reasonable jury could find, however, that the conch sales were merely a cover for the crew's drug operations. That the defendants never offered any tangible evidence of the conch sales (e.g., receipts or proceeds) tends to support the view that those sales were not a primary concern.

11. The statement by Nelson Davis at the time of his arrest is an additional fact supporting his conviction. His comment that the officers need not tear up the vessel during their search might be interpreted as an innocent attempt to protect the Princess Dean II. Yet a reasonable jury could also believe that Davis was responding to Officer Alaimo's question whether there was contraband other than the pills in the rope locker. The jury could find that Davis knew that the remaining drugs were in a drawer under the master bed. Thus, a violent search would not be necessary to uncover them.

of constructive possession is some measure of dominion and control over the contraband. Dominion and control can either be exclusive or shared. *United States v. Blasco, supra,* 702 F.2d at 1330.

As we have seen, the jury could infer that Bain and Davis knew of the quaaludes in the rope locker. Because the 44,000 pills were in a locker in the appellant's own cabin, the jury could also find that the crewmen exercised some measure of dominion and control. *Id.*

■ Even if one of the other conspirators exercised actual control over the drugs, the convictions of Bain and Davis may be affirmed because they aided and abetted the possession. *See United States v. Schwartz,* 666 F.2d 461, 463 (11th Cir. 1982). Count 2 of their indictments charged a violation of 18 U.S.C. § 2 (the aiding and abetting statute) as well as 21 U.S.C. § 955a(c) (the substantive possession provision). Thus, the trial court properly instructed the jury that the defendants could be convicted as principals if they aided and abetted the commission of the crime. *See* Record at 67.

■ In order to sustain the convictions for aiding and abetting,

the prosecution must show that the defendant "associated himself with a criminal venture, participated in it as something he wished to bring about and sought by his actions to make it succeed." *United States v. Smith,* 631 F.2d 391, 395 (5th Cir.1980). *See United States v. Hewitt,* 663 F.2d 1381, 1385 (11th Cir.1981); [*United States v. Martinez,* 555 F.2d 1269, 1272]. Moreover, in the context of a prosecution for aiding and abetting the possession of [quaaludes] with intent to distribute, the government "must introduce evidence connecting defendant with both aspects of the crime, possession and intent to

distribute." *United States v. Longoria,* 569 F.2d 422, 425 (5th Cir.1978).

*United States v. Schwartz, supra,* 666 F.2d at 463. As knowing members of the conspiracy, Bain and Davis participated in the criminal venture; the jury could infer that the defendants shared the intent to distribute the quaaludes. Moreover, Bain and Davis aided and abetted the possession of the drugs by helping to operate the vessel while it was transporting the quaaludes to Miami. *See United States v. Mazyak, supra,* 650 F.2d at 791 (ship's crewmen convicted of possession), *cited in United States v. Schwartz, supra,* 666 F.2d at 464; *cf. United States v. Maspero,* 496 F.2d 1354, 1359 (5th Cir.1974) (driver of truck having constructive possession over cargo).[12]

## II. Search Of The Vessel

Appellant Bain challenges the warrantless search of the Princess Dean II and argues that evidence of any pills found on board should be suppressed. He admits that the officers had authority to board the vessel and examine its customs documents. *See United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 2582, 77 L.Ed.2d 22 (1983); 19 U.S.C. § 1581(a) (1976). Bain contends, however, that the authority was limited to inspecting documents in a public area of the vessel and did not permit a search of the private cabins and Mrs. Dean's purse. We agree that the initial boarding was limited to the inspection of documents, but we hold that lawful observations by the officers in the course of their inspection engendered sufficient probable cause coupled with exigent circumstances to justify the further search.

It is clear that the officers were authorized to make the initial boarding. In *United States v. Villamonte-Marquez,* the Supreme Court held that Customs officials, acting pursuant to 19 U.S.C. § 1581(a) and

---

12. Normally, substantive possession by any co-conspirator could be imputed to Bain and Davis because they participated in the quaalude conspiracy. *See Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); *United States v. Blasco, supra,* 702 F.2d at 1330, 1331; *United States v. Garcia,* 655 F.2d 59, 62 (5th Cir.1981). In this case, however, the trial court did not instruct the jury about the imputation of guilt. Therefore, we cannot rely on that theory in affirming the convictions under Count 2.

without any suspicion of wrongdoing, may board for inspection of documents a vessel that is located in waters providing ready access to the open sea. 103 S.Ct. at 2575, 2582. In the present case, the original boarding by Officers Alaimo and Leon was. for the purpose of inspecting documents. At the time, the Princess Dean II was located in Miami harbor which provides ready access to the sea. The requirements of *Villamonte-Marquez* were met.[13]

■■■ While customs officials are making such an inspection, they may observe evidence which is in plain view around them. *See United States v. Villamonte-Marquez, supra,* 103 S.Ct. at 2577 (officer smelled marijuana and spotted burlap-covered bale through open hatch); *United States v. Freeman,* 579 F.2d 942 (5th Cir.1978) (officer looked through hatch and saw woman hiding in a corner). If such evidence gives the officer probable cause to believe that the vessel contains illegal contraband and if there are exigent circumstances, the officers may conduct a search of the private areas of the vessel. *See United States v. Villamonte-Marquez, supra,* 103 S.Ct. at 2577; *United States v. Herrera,* 711 F.2d 1546, 1556 (11th Cir.1983); *see also United States v. Odom,* 526 F.2d 339, 342 (5th Cir.1976) (search by Coast Guard officers pursuant to 14 U.S.C. § 89(a)).

■■■ The observations and knowledge of Officers Alaimo and Leon gave rise to probable cause. They approached the vessel knowing that a confidential informant had reported suspicious activities on board. They knocked once on the side of the vessel and, receiving no answer, had to knock again on the door before Bain appeared. Once inside the cabin, they discovered that Captain Dean had no customs documents. This was unlawful in itself and raised suspicions that the vessel was carrying cargo subject to customs enforcement. The officers also noticed that the vessel was un-

usually plush for a fishing vessel. Finally, when Bain was sent below to roust out the crew, he did not reappear for several minutes and was seen moving suspiciously back and forth between the same cabins several times.

The totality of these facts created probable cause to believe that there was illegal contraband on board. *Cf. United States v. Odom,* 526 F.2d 339 (5th Cir.1976) (suspicious acts by captain, lack of fishing equipment on vessel, and officers' sight of burlap bags in cargo area created probable cause).

There were also exigent circumstances justifying the immediate search of the vessel. Officer Leon's original decision to go below was supported by a reasonable fear that the crewmen were collecting weapons or destroying evidence. *See United States v. Marszalkowski,* 669 F.2d 655, 665 (11th Cir.1982) (possibility that suspects are armed and dangerous or that they are disposing of narcotics justifies "protective sweep").[14] Furthermore, even after the crewmen and Mrs. Dean were rounded up, the mobility of the vessel was an exigent circumstance justifying an immediate search. *See United States v. Ross,* 456 U.S. 798, 806, 102 S.Ct. 2157, 2162–63, 72 L.Ed.2d 572 (1982); *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1927); *United States v. Freeman, supra,* 579 F.2d at 948. The search of the entire vessel was constitutionally permissible because of the combination of probable cause and exigent circumstances. *Id.*

### III. Statements Concerning Marijuana Residue

■■■ Before trial, the District Judge granted a motion *in limine,* suppressing evidence of the marijuana residue found in Bain and Davis's cabin. The prosecutor (Mr. Noto) instructed his witnesses not to

---

**13.** That the officers may have had suspicion of other wrongdoing does not prevent them from making a *Villamonte-Marquez* search. *See* 103 S.Ct. at 2577 n. 3; *United States v. Herrera,* 711 F.2d 1546, 1554 n. 13 (11th Cir.1983).

**14.** During that sweep, Officer Leon observed that Mrs. Dean acted nervous and hid a case within her purse. These observations further substantiated the suspicion that there was contraband on board.

mention the residue; and during trial he made no reference to the evidence. When Officer Alaimo took the stand, however, he accidentally mentioned the marijuana:

Q [by Mr. Noto]: Did you tell your partner where you found the Quaaludes?

A: Yes.

Q: What did you do after that?

A: He informed me that he had found marijuana residue.

Q: No. No. Not what somebody told you.

Trial Transcript at 47.

The trial court immediately instructed the jury to ignore the remark, *id.*, but the defendants moved for a mistrial. The motion was denied.

We affirm the court's ruling. Although Officer Alaimo's testimony certainly violated the pre-trial order, the error was harmless. The potential for prejudice was muted by the court's immediate curative instruction. *See United States v. Smith*, 635 F.2d 411, 412–13 (5th Cir.1981); *United States v. Sklaroff*, 552 F.2d 1156, 1162 (5th Cir.1977). The prosecutor did not mention the evidence again. On the contrary, there was only one reference to the marijuana "and that reference was neither made nor elicited by the prosecution, but instead resulted from a spontaneous remark made by the witness." *Id.; see also United States v. Smith, supra,* 635 F.2d at 413. The trial court did not err in denying a mistrial.

## CONCLUSION

The reasonable doubt standard requires us to be ever vigilant in assuring that defendants are not convicted on the basis of their location alone. Mere presence on board a vessel cannot suffice to prove the complicity of the crew. This is not such a case, however. The totality of the evidence against Bain and Davis was sufficient to support the jury's verdict.

Moreover, the trial judge properly admitted evidence of the quaaludes. The search of the Princess Dean II by Officers Alaimo and Leon did not violate the Fourth Amendment.

Finally, Alaimo's spontaneous reference to marijuana residue was harmless error under the circumstances of this case. In sum, the appellants raise no grounds justifying reversal. Their convictions are

AFFIRMED.