[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-11015
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 9, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00123-CR-3-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TERRENCE S. OWDEN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(September 9, 2009)

Before WILSON, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

Terrence Owden appeals his convictions for conspiracy to possess with

intent to distribute 500 grams or more of cocaine and possession with intent to

distribute 500 grams or more of cocaine. After a thorough review of the record, we affirm.

I. Background

Owden and Cecil Lee Williams were indicted for conspiracy to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846 (Count 1), and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841 (Count 2).[1] Owden was also charged with using and carrying a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c) (Count 3).[2]

Prior to trial, Owden moved to suppress the evidence seized from his home on the ground that the statements cited in the supporting affidavit for the search warrant were false and misleading.[3]

At the suppression hearing, Owden did not call any witnesses; rather the court heard the parties on the issue. He asserted that there was no evidence to establish Williams was sufficiently reliable for his information to establish probable cause. Owden further argued that the statements in the warrant affidavit were misleading

---

[1] Williams agreed to plead guilty and testified against Owden at trial.

[2] Owden does not challenge his conviction on Count 3 on appeal.

[3] Owden supplemented his motion to challenge the search of his home, but he later withdrew that argument.

because the transcript of the calls between Williams and his contact "MeMe" did not establish that Owden was there to pick up the drugs.

Owden submitted the transcripts of the calls. The conversation in the first call ("Call 1") was as follows:

Williams:  Man . . . man my truck broke down.
MeMe:  I'm about leaving from Texas.
Williams:  Oh you're leaving from Texas.
MeMe:  Yeah.
Williams:  Ah, so yo . . yo, your cousin . . . where your cousin at?
MeMe:  Alright I'm saying he at home.
Williams:  Cause shit I'm over here some where with this truck and I got this stuff . . . stuff . . . stuff in the truck man. I don't want anybody seeing me fix this truck and pull up on me.
MeMe:  Alright . . . I am fixing to call him and get his number. . . answer the phone.
Williams:  Alright then.

The second call was between Williams and Owden in which Williams told Owden he was broken down by the grocery store on 29 ("Call 2"). Owden stated that he would head that way. In the third call, Owden asked Williams for directions to his location ("Call 3"). At the end of the call, the following exchange occurred:

Williams:  Cause I . . . I got the . . . stuff right there in the truck and the truck broke down I don't want nobody to roll up on me.
Owden:  Alright you say you have to pass Walmart and all that shit through 9 mile and all that
Williams:  Yea you are gonna see my truck on . . when you coming down you gonna see my truck on the left hand side.
Owden:  Alright.

3

Williams:     I got the hood open.
Owden:     Alright.

In the last two phone calls ("Call 4" and "Call 5"), Owden again asked for directions.

In addition to the transcripts of the calls, the warrant application stated that Williams admitted delivering drugs a few weeks earlier to a house agents were able to link to Owden, Williams identified his contact as MeMe, the phone records confirmed that Williams, MeMe, and Owden made multiple calls to each other the morning of the arrest, and Owden arrived and retrieved the drugs from Williams after Williams informed MeMe the truck had broken down. Based on these facts in the warrant application, the court denied the motion to suppress because the statements in the warrant were a reasonable interpretation of the conversations between Williams and MeMe.[4]

At the beginning of trial, the court instructed the jury that statements by the attorneys were not evidence and that the jury could not consider Owden's decision not to testify as evidence of guilt because Owden had the right to remain silent.

The evidence at trial established the following: On October 7, 2007,

---

[4] Owden renewed his motion to suppress during trial on the ground that the testimony confirmed that the statements in the affidavit were false and there was no evidence Williams was reliable. The court overruled the motion, finding that the statements were a reasonable interpretation of William's information based on the officer's experience and the events that followed the calls.

4

Williams was stopped for speeding while driving his pick-up truck from Atlanta to Pensacola. Escambia County police conducted a search during the traffic stop and found three kilograms of cocaine in the tool compartment in the back of the truck. Williams immediately agreed to cooperate with authorities. DEA agent David Humphreys arrived and interviewed Williams, at which time Williams informed the authorities that he was delivering the three kilograms of cocaine to MeMe at a yellow one-story house. He did not know the address but he gave directions and admitted that he had delivered one kilogram of drugs to MeMe at the same house two weeks earlier. He also told Humphreys that Owden was MeMe's cousin and had been at the house when Williams made the earlier delivery. He stated that when he delivered the drugs previously, he had called MeMe as he was exiting the highway and then drove to the house where Owden met him and instructed him to pull around back. Owden had taken the drugs from Williams and put the bag in a little shed off the driveway. Williams had been in this shed before and had seen a gun there. After he delivered the drugs, Williams met MeMe at another house to receive his money for the delivery. Humphreys confirmed the yellow house was in Owden's name. Humphreys also identified MeMe as Owden's cousin, Joseph Posey, who listed Owden's home as his residence.

On October 7, Williams called MeMe as planned as he was exiting the

highway, which was about an hour before he was stopped. After he was caught and agreed to cooperate, he placed a recorded call (Call 1) to MeMe under Humphrey's supervision to inform MeMe the truck had broken down and he did not want to get caught with the "stuff." MeMe said he was in Texas but would call his cousin. A few minutes later, Williams received Call 2 from Owden. According to Williams, Owden knew Williams was delivering drugs. This was the first time, however, Owden had called Williams; earlier communications had been between Williams and MeMe. Owden then called Williams several more times as he drove to meet Williams.

Following the stop and while Williams and the authorities waited for Owden to arrive, Escambia County Sheriff's Deputy Eugene Jackson moved the truck to a nearby lot and put the hood up to make it look as if the truck had broken down. The deputies and DEA agents took positions out of sight while they waited for Owden. When Owden arrived, he asked Williams what was wrong with the truck. Williams replied it was broken down. Owden then pulled along side the truck, unlocked the doors, and took the bag Williams handed him from the tool compartment.[5] After Owden took the bag, the authorities surrounded Owden and Williams and instructed them to get on the ground. Williams complied, but Owden

---

[5] The DEA had replaced the cocaine with sham drugs packaged to appear as the real cocaine.

dropped the bag and moved away from the officers. The DEA agents boxed Owden in and were able to take him into custody. Humphreys videotaped the meeting between Williams and Owden, but had turned the recording off to assist in the arrest. The video did not show Owden handling the bag of sham cocaine.[6]

Williams and Owden were arrested and placed in separate patrol cars. Williams had another cell phone in his possession, unbeknownst to the authorities, and placed several calls from the back of the patrol car. One call was to MeMe to tell him Williams and Owden had been arrested. Williams also called his family to tell them to call "Primo," who was the source of the drugs. Williams explained that he was afraid of MeMe and Primo and did not want MeMe to know he had been cooperating. At trial, Williams admitted that he had not been completely truthful with authorities during his cooperation, at one point stating that he did not know the source of the drugs.

Owden had two phones in his possession when he was arrested. Both were pre-paid phones with no name assigned and were from other calling areas. According to Humphreys, drug dealers often used cell phones from different calling areas in order to conceal their locations. One of Owden's phones matched

---

[6] The video was admitted into evidence, over Owden's objection that the officers destroyed evidence by turning the video off just prior to the actual arrest. Upon questioning by the court, counsel conceded that the officers were not obligated to tape the events at all. Thus, the court concluded that there was no discovery violation and denied the motion.

calls made to Williams and MeMe.  Records for MeMe's phone also showed calls to Williams and Owden.

Humphreys detailed the time-line of calls between Owden, Williams, and MeMe showing the following connections: From September 24 through October 7, there were thirty-three calls between Williams and MeMe.  From September 24 through October 4, there were seventeen calls between Owden and MeMe.  On October 5 and 6, there were five calls between Williams and MeMe.  On October 7, there were ten calls between Owden and MeMe and eleven calls between Owden and Williams.

Specifically, on October 7, MeMe called Williams at 6:30 a.m.  Williams called MeMe at 7:45 a.m., which corresponded with the time Williams exited the expressway.  There were then four calls from MeMe to Owden.  At about 9:25 a.m., roughly the time Williams would have arrived at Owden's house, Williams called MeMe to tell him the truck was broken down.  Minutes later, MeMe called Owden and then Owden called Williams.

Humphreys sought a search warrant for Owden's house.  Although Williams and Owden had been arrested, MeMe was unaccounted for and agents could not confirm MeMe was in Texas as he claimed in the calls.  The affidavit for the search warrant had been submitted by Escambia County narcotics investigator Rene

Reguindin and was based on Williams's statements and the comments Reguindin heard listening to Williams's side of the calls with MeMe and Owden. Reguindin admitted, however, that he had not listened to the full recordings, but rather took Williams's word for the conversations. Nevertheless, Reguindin believed the affidavit was an accurate summary based on Williams's portion of the conversations and what happened after Owden arrived. While awaiting the warrant, Humphreys arrived at Owden's house and found six people, including MeMe's mother and Owden's mother, on the porch. Humphreys entered the house to secure it, but did not conduct a search. After the warrant arrived, Humphreys and Reguindin searched the shed and found security surveillance equipment enabling Owden to observe the street and driveway. They also found scales with drug residue, baggies, baking soda to cut the drugs, marijuana, loose dollar bills, a jacket with papers in the pocket in Owden's name, $1,500 cash, a picture of MeMe, and a loaded pistol. Humphreys confirmed the firearm was registered in Owden's name and had been purchased on September 13, 2007. The shed was kept locked and, according to Owden's mother, Owden had the only key. The key was in Owden's possession when he was arrested.

Owden moved for judgment of acquittal on all counts. The court denied the motion. Owden did not testify.

9

During closing argument, defense counsel argued that Williams withdrew from the conspiracy when he agreed to cooperate, and thus there was no conspiracy involving Owden. In rebuttal, the government corrected defense counsel's definition of withdrawal, stating,

> It's not when Williams withdrew from the conspiracy that makes him no longer a part of it. It's when the defendant withdrew from the conspiracy, and he no longer becomes a part of it. And he had never withdrawn from it. To this very day he's a part of it, because he is continuing to deny his role in this.

Defense counsel objected to this statement as an improper comment on Owden's right to remain silent and moved for a mistrial. The court overruled the objection and denied the motion. In its instructions to the jury, the court stated that the jury was not to consider Owden's decision not to testify, and it reminded the jury that statements by attorneys did not constitute evidence.

The jury convicted Owden on all counts. The court sentenced Owden to 196 months' imprisonment, which consisted of 136 months on Counts 1 and 2, to run concurrently, and a consecutive 60-month sentence for the § 924(c) offense in Count 3. This appeal followed.

II. Discussion

Owden raises several issues on appeal, only three of which merit

discussion.[7]  First, Owden challenges the denial of his motion to suppress on the ground that statements in the affidavit for the search warrant allegedly were false. Second, Owden asserts that there was insufficient evidence to support his convictions.  Third, Owden contends the video tape should have been excluded on the ground that the evidence violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) because the police failed to record the entire arrest when they voluntarily stopped the tape.

A. Standards of Review

In reviewing the denial of a motion to suppress, we review findings of fact for clear error and the application of the law to those facts de novo.  United States v. Newsome, 475 F.3d 1221, 1223 (11th Cir. 2007).  We construe all facts in the light most favorable to the prevailing party, in this case the government.  Id. at 1223-24.  We review the district court's determination that an affidavit established probable cause de novo and its findings of fact for clear error, and give due weight

---

[7] Owden also challenges the prosecutor's statements during closing argument. Upon review, we conclude the prosecutor's statement was not an improper comment on Owden's right to remain silent.  First, it was a single isolated statement made during the government's rebuttal closing argument and it was intended to explain defense counsel's misstatement about the law regarding withdrawal from a conspiracy.  The prosecutor was not asking the jury to penalize Owden for Owden's decision not to testify.  United States v. Dodd, 111 F.3d 867, 869-70 (11th Cir. 2008). Second, the court instructed the jury that statements by the lawyers were not evidence and that the defendant's decision not to testify should not be held against him, and we presume that the jury followed the court's instructions.  United States v. Brown, 983 F.2d 201, 202 (11th Cir. 1993). Third, the evidence against Owden was overwhelming, leaving no reasonable probability that the outcome of the trial would have been different but for this comment.  In light of these facts, we further conclude that, even if the statement were improper, the error was harmless.

11

to the inferences that the judge and law enforcement officers drew from the facts. United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000). In addition, we review for clear error the district court's decision that misrepresentations or omissions in an affidavit were not reckless or intentional. United States v. Jenkins, 901 F.2d 1075, 1079 (11th Cir. 1990).

We review sufficiency of the evidence claims de novo, drawing all reasonable inferences in favor of the government. United States v. Hernandez, 433 F.3d 1328, 1332 (11th Cir. 2005). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994) (quotations omitted).

We review de novo a district court's conclusion that there was no Brady violation. United States v. Mejia, 82 F.3d 1032, 1036 (11th Cir. 1996).

B. Motion to Suppress

Owden argues that the court should have suppressed the evidence seized from his home because the statements in the warrant affidavit were false and, if the statements are removed, the affidavit does not establish probable cause. Owden further argues that the court should have granted his renewed motion to suppress because the evidence at trial showed that Reguindin did not hear both sides of the

12

calls and Williams was not shown to be reliable.

In order to establish probable cause, a search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (quotation marks and citation omitted). The Fourth Amendment is violated if a warrant is obtained by using a false statement that was made intentionally or recklessly. Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). Under Franks:

> [A] defendant may challenge the veracity of an affidavit in support of a search warrant if he makes a substantial preliminary showing that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause. If he does so, he is entitled to an evidentiary hearing on the issue.

United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006) (quotation marks and citations omitted). It can be inferred that an omission was made with a reckless disregard for the accuracy of the affidavit "when the facts omitted from the affidavit are clearly critical to a finding of probable cause." Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997) (quotation marks and citation omitted). However, omissions that are merely negligent or insignificant and immaterial will not invalidate a warrant. Id. Moreover, even if the defendant

13

meets his burden, the warrant is still valid "when material that is the subject of the alleged falsity or reckless disregard is set to one side, [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause." Franks, 438 U.S. at 171, 98 S.Ct. at 2684.

Here, Owden did not meet his burden. First, Owden has not shown that Reguindin included false statements or acted with reckless disregard for the truth of the statements. Reguindin's statements in the affidavit were an accurate representation of the telephone conversations in light of the events that morning. See, e.g., United States v. Awan, 966 F.2d 1415, 1428-31 (11th Cir. 1992) (upholding the admission of an undercover officer's explanations of comments made by the defendant during tape-recorded conversations with the officer); United States v. Russell, 703 F.2d 1243, 1248 (11th Cir. 1983) (upholding the admission of a law enforcement agent's testimony concerning the meaning of tape-recorded conversations he had with the defendant).

Even if the statements were inaccurate, the remainder of the warrant was sufficient to establish probable cause. The affidavit detailed the prior drug delivery and described the events that occurred after the series of phone calls leading to Owden's arrival, including that Owden took possession of the bag of drugs. Additionally, the affidavit alleged that Williams had delivered drugs to the house

14

that was the subject of the warrant in the past few weeks and agents were able to connect Owden to the house. All of this was sufficient to establish probable cause even if the statements regarding the recorded calls were removed because the facts, taken together, were sufficient to justify the conclusion that "evidence or contraband [would] probably be found at the premises to be searched." Martin, 297 F.3d at 1314.

Finally, to the extent that Owden argues Williams was unreliable and therefore the warrant lacked probable cause, that argument is without merit. An "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles the [informant's] tip to greater weight than might otherwise be the case." United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002) (quoting Illinois v. Gates, 462 U.S. 213, 234, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Moreover, "observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search." Id. (citing United States v. Kirk, 781 F.2d 1498, 1505 (11th Cir. 1986)). Here, the events the morning of the arrest corroborated Williams's statements. Accordingly, the district court properly denied the motion to suppress.

C. Sufficiency of the Evidence

15

Owden next argues that the evidence was insufficient to support his convictions for conspiracy and possession because (1) there was no evidence of any agreement to possess cocaine, and (2) he was never in actual or constructive possession of the drugs. He notes that his mere presence is insufficient to establish any agreement and the only evidence at trial was Williams's testimony.

The "uncorroborated testimony of an accomplice is sufficient to support a conviction in the Federal Courts if it is not on its face incredible or otherwise insubstantial." United States v. LeQuire, 943 F.2d 1554, 1562 (11th Cir. 1991). Testimony is incredible or insubstantial only if it is "testimony as to facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." Id. at 1562 (quotation marks and citation omitted) (alteration in the original). In reviewing witness testimony, "[t]he jury gets to make any credibility choices, and we will assume that they made them all in the way that supports the verdict." United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006). "It is emphatically not within the province of an appellate court to reweigh the evidence and the credibility of the witnesses at trial." United States v. Hernandez, 141 F.3d 1042, 1052 (11th Cir. 1998).

1. Conspiracy

Conspiracy to possess cocaine with intent to distribute requires the

16

government to prove beyond a reasonable doubt "(1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006) (quotation omitted). The agreement forming the basis of the conspiracy can be proved "by circumstantial evidence, through 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.'" United States v. Obregon, 893 F.2d 1307, 1311 (11th Cir. 1990) (citation omitted). "Where the government's case is circumstantial, reasonable inferences, and not mere speculation, must support the jury's verdict." United States v. Mejia, 97 F.3d 1391, 1392 (11th Cir. 1996). Moreover, "[m]ere presence, guilty knowledge, even sympathetic observation" and close association with a co-conspirator are insufficient, without more, to support a conviction for conspiracy to distribute drugs. United States v. Lyons, 53 F.3d 1198, 1201 (11th Cir. 1995). Yet, such factors may raise a permissible inference of participation in a conspiracy, which the jury may consider as a "material and probative factor . . . in reaching its decision." United States v. Hernandez, 896 F.2d 513, 518 (11th Cir. 1990).

"A defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." United States v. Bain,

736 F.2d 1480, 1485 (11th Cir. 1984). The evidence of prior drug activity may establish intent. United States v. Roberts, 619 F.2d 379, 383 (5th Cir. 1980)[8] (holding that a prior conviction increases the likelihood that the defendant intended to conspire to commit similar subsequent criminal conduct). In addition, there is a general principle that, in cases involving large amounts of narcotics, "a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders." United States v. Cruz-Valdez, 773 F.2d 1541, 1547 (11th Cir. 1985).

Here, the evidence was sufficient for the jury to infer that Owden knew he was receiving a delivery of drugs when he went to assist Williams that day. Williams confirmed that he had delivered drugs to Owden's home a few weeks earlier under similar circumstances, and there were numerous calls between MeMe, Williams, and Owden in the weeks before the October 7 delivery and arrest. In addition, Owden's actions on that day are consistent with the jury's inference that Owden was involved in the conspiracy. Finally, there was evidence from which the jury could have concluded that Owden attempted to escape rather than be arrested, and flight may be considered as evidence of guilt.[9] See United States v. Williams, 541 F.3d 1087, 1089 (11th Cir. 2008). Based on this evidence, the jury

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this court held that all decisions handed down by the former Fifth Circuit before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit.

[9] The district court declined to give an instruction that flight was evidence of guilt.

could have inferred Owden knew of and voluntarily participated in an agreement to possess drugs.

2. Possession

In order to obtain a conviction for possession with intent to distribute drugs, the government must "prove three elements: (1) knowledge; (2) possession; and (3) intent to distribute." United States v. Poole, 878 F.2d 1389, 1391 (11th Cir. 1989). These elements may be proved by either direct or circumstantial evidence. Id. at 1391-92. Possession may be actual or constructive. A defendant has actual possession of a substance when he has direct physical control over the contraband. United States v. Edwards, 166 F.3d 1362, 1363 (11th Cir. 1999). An intent to distribute can be inferred from the quantity of drugs involved. United States v. Tinoco, 304 F.3d 1088, 1123 (11th Cir. 2002).

Here, the evidence established that Owden took the bag of sham cocaine from Williams just before the police initiated the arrest. Accordingly, the evidence was sufficient to show Owden possessed the drugs.

The evidence also established that Williams had delivered drugs to Owden's home a few weeks earlier in a similar arrangement with MeMe. Moreover, the calls between Williams, MeMe, and Owden, and the events that followed those calls, enabled the jury to infer Owden knew the bag contained drugs.

19

D. Video

Owden contends that absence of the full video constituted a discovery violation under Brady v. Maryland, 373 U.S. 83 (1963). We disagree.

A successful Brady "claim requires three elements: (1) the prosecution suppressed evidence, (2) the evidence suppressed was favorable to the defense or exculpatory, and (3) the evidence suppressed was material. Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Starrett, 55 F.3d 1525, 1555 (11th Cir. 1995) (citations and quotations omitted); see also United States v. Vallejo, 297 F.3d 1154, 1164 (11th Cir. 2002); United States v. Newton, 44 F.3d 913, 918 (11th Cir. 1994). A district court may decline to order discovery "based upon mere speculation as to whether the material would contain exculpatory evidence because to do so would convert Brady into a discovery device and impose an undue burden upon the district court." United States v. Arias-Izquierdo, 449 F.3d 1168, 1189 (11th Cir. 2006).

As Owden concedes, the government was under no obligation to video the events at all. See e.g., United States v. Arteaga, 807 F.2d 424, 426-27 (5th Cir. 1986). Accordingly, Owden's Brady claim fails because he cannot show that the

20

government possessed the evidence, that the government suppressed it, or that there was a reasonable probability that the evidence would have affected the outcome of the trial.

III. Conclusion

For the foregoing reasons, we AFFIRM Owden's convictions.