UNITED STATES of America, Plaintiff,

v.

**Evelio Anibel MARRERO, Defendant.**

**No. 86–1031–CR.**

United States District Court,
S.D. Florida,

March 16, 1989.

Bruce E. Lowe, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Neal R. Sonnett, Ira N. Loewy, Miami, Fla., for defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL

MARCUS, District Judge.

THIS CAUSE was tried before the Court and a jury with a resultant verdict finding the Defendant Evelio Anibel Marrero guilty of both counts of the Indictment, which charged conspiracy to distribute cocaine (Count I) and the distribution of at least five kilograms of cocaine (Count II), in violation of Title 21, U.S.C. §§ 846, 841(a)(1) and Title 18, U.S.C. § 2. Defendant has filed a Motion for a Judgment of Acquittal under Fed.R.Crim.P. 29(c), and an alternative request for a new trial, alleging that co-conspirator's statements were improperly admitted into evidence and that the Government failed to adduce legally sufficient evidence to prove either that Marrero had knowingly participated in the conspiracy to distribute cocaine or that he had intentionally distributed the cocaine. After having reviewed pertinent excerpts of the trial testimony, taken extensive ar-

gument and having carefully considered all of the evidence in light of the presumptions in favor of the jury's verdict and the guiding case law, we now DENY the Defendant's alternative motions.

## I.

Defendant Marrero was charged with conspiracy to distribute cocaine along with Eduardo Flores, Fernando Morales and Alfredo Marcellino Sanchez. The Defendant Marrero does not challenge that these co-defendants were involved in a cocaine distribution conspiracy, but rather asserts that the proof "falls woefully short of demonstrating that MARRERO even knew of the existence of the conspiracy, let alone that he knowingly and voluntarily joined it." [Defendant's initial Motion for Judgment of Acquittal at 3]. Defendant admits that the evidence proved the following facts:

> ... Marrero may have been in the area of the Sofitel Hotel, in the company of co-defendants Sanchez and Morales on December 17, 1986, the date that Sanchez had a meeting with Special Agent Kibble and the confidential informant and that when arrested, Marrero was in the company of Flores at a shopping center, shortly after Flores had participated in a meeting at Sanchez's house, at which cocaine transactions were discussed.

*Id.* at 4.

It is by now axiomatic that in ruling on a criminal defendant's post-verdict motion for a judgment of acquittal, we must view all of the evidence in the light most favorable to the government, *Burks v. United States,* 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2149–2150, 57 L.Ed.2d 1 (1978); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), while drawing all reasonable inferences and credibility choices in favor of the jury's verdict. *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974). The standard we apply is the same as that used by a court of appeals in reviewing a challenge to the sufficiency of the evidence on appeal by the defendant.

*See United States v. Burns,* 597 F.2d 939, 941–42 (5th Cir.1979) (when government appeals from a district court's order granting a post-trial judgment of acquittal, the same standard of review applies as if the defendant were appealing directly from the jury's verdict). In fact, if we were to conclude that the evidence here was insufficient to support the verdict, such a finding would be entitled to no deference by the reviewing court. *United States v. Greer,* 850 F.2d 1447, 1450 (11th Cir.1988); *Burns, supra.* Therefore, we apply the standard enunciated in *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B, *en banc*), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)— that is, the evidence need not be wholly inconsistent with every reasonable hypotheses except that of guilt, because the jury was free to choose among reasonable constructions of the evidence, as long as the evidence supports the jury's conclusion that the defendant is guilty beyond a reasonable doubt. *United States v. Alexander,* 850 F.2d 1500, 1505 (11th Cir.1988). Moreover, this test is the same, whether applied to direct or circumstantial evidence because the law does not give greater weight to either type of evidence. *United States v. Gonzalez,* 719 F.2d 1516, 1521 (11th Cir.1983), *cert. denied,* 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 710 (1984).

Inasmuch as the Defendant has conceded the existence of the conspiracy and the knowing participation of co-defendants Flores, Morales and Sanchez, our job is simply to decide whether the evidence, when combined with the inferences which can be drawn therefrom, was sufficient to permit the introduction of two sets of co-conspirators' statements, and, whether all of the evidence was sufficient to support the verdict. *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

## II.

A detailed explication of the facts elicited at trial is essential to the disposition of this issue. The story begins when Francisco Fumorala began working as an informant

for the Drug Enforcement Administration (DEA) in Madrid, Spain. Through a Bolivian, Fumorala was put in touch with Alfredo Sanchez. Fumorala and DEA Special Agent James Kibble flew from Madrid to Miami, where Fumorala met with Alfredo Marcelleno Sanchez. Sanchez represented that he knew people who could obtain cocaine for sale to persons known to Fumorala. When Fumorala related this conversation to Agent Kibble, Kibble encouraged Fumorala to arrange a cocaine transaction. The first negotiations failed and Kibble and Fumorala returned to Spain.

Further international telephone conversations between Sanchez and Fumorala took place soon thereafter, in December 1986. Fumorala, purporting to act as an intermediary for a Frenchman and an Englishman, discussed with Sanchez the possible purchase of a large quantity of cocaine—from 50 to 200 kilograms for $22,000 to $23,000 per kilo. Fumorala said he and the Englishman would fly to Miami. Sanchez agreed to pay for *one* airline ticket and Fumorala was to pay for the other one.

With hopes of consummating the cocaine deal, Fumorala and Agent Kibble, posing as an Englishman named Eddy Vaughn, again flew to Miami and were met at the airport by Sanchez. Agent Kibble rented a car and he and the informant took a room at the Fountainbleau Hotel, where they remained for the night. The next day, December 17, 1986, Sanchez reported that his people mistrusted the informant's people, and, accordingly, that they did not want to make the first proposed delivery of five kilograms, to be followed by fifteen or twenty, and then twenty-five, as had been arranged. Kibble feigned anger, said that he would return to Europe immediately, paid the hotel bill and put his luggage into the rental car. In an effort to keep the deal from falling apart, Sanchez offered to pay Kibble's return airfare as well as the hotel and rental car expenses until the deal could be completed. Kibble refused, but Fumorala stayed with Sanchez to attempt to work out the problems. Kibble returned the rental car at the airport. He then telephoned Fumorala at Sanchez's home. Sanchez agreed to obtain Kibble's return flight ticket and take them to another hotel. Kibble agreed.

That afternoon, Sanchez and Fumorala picked up Kibble at the airport. They went to the Sofitel Hotel and checked in, Sanchez arranging with the hotel to use his credit card to pay for the hotel room for Kibble and Fumorala. Sanchez then left, stating that he would obtain the airplane tickets and return around 6:30 or 7:00 p.m.

Fumorala and Kibble waited in the hotel room until the appointed time for Sanchez's return. Fumorala went downstairs and stood outside near the entrance to the hotel. He observed Sanchez drive into the parking lot alone in a car. Sanchez parked and exited the car, but did not walk toward Fumorala. Instead, he went to a second car which was only a few meters from Sanchez's car. Defendant Marrero emerged from the front passenger side of the second car. At least one other person was seen sitting in the back and there was a driver. Surveillance agents identified the other two men as being co-defendants Morales and Flores. Sanchez approached Defendant Marrero and showed Marrero the two airplane tickets that Sanchez had just obtained for Fumorala and Kibble. Fumorala was some six to ten meters away. He walked toward the two men. At that time, the two men both turned to Fumorala as he approached. They had a further conversation which Fumorala could not overhear, after which Defendant Marrero re-entered the second car and drove off immediately.

When Fumorala reached Sanchez, he was handed two airline tickets—the same tickets Sanchez had just shown to Defendant Marrero. Fumorala asked Sanchez why those people had left in a hurry and Sanchez responded, "That gentleman, he is like my father to me." Sanchez also described the Defendant Marrero as "a big padrino," or a "great godfather" in Miami,[1] and added that "he doesn't want to know anyone."

---

**1.** Fumorala had previously told Sanchez that the Frenchman he worked for was a "great godfather" in France. Fumorala understood and used the term to describe someone in the narcotics business.

Sanchez then went into the hotel room, paid for the room with his credit card and left.

Fumorala took the airline tickets upstairs to Agent Kibble. Again, they waited for Sanchez to return to the hotel later that night. Sanchez returned, and while Kibble remained in the hotel, he took Fumorala to Miami Beach, where they met co-conspirator Morales at a street corner near a Denny's Restaurant. Sanchez and Morales spoke briefly out of Fumorala's hearing. After Fumorala exited the car, Morales got into it and drove off. Sanchez told the informant that Morales was going to be talking to the other person "who was holding the merchandise." Sanchez and Fumorala walked around looking at the buildings while engaging in idle conversation for a short time. One of the landmarks Fumorala remembered seeing directly across the street from the Denny's Restaurant was the San Juan Hotel. The evidence revealed that Defendant Marrero had been the resident manager at a hotel at 1587 Washington Avenue on Miami Beach until three years earlier, at which time he moved to 115 Venetian Way. The hotel on Washington Avenue was about five minutes away from the San Juan Hotel. Additionally, the evidence revealed that co-defendants Morales and Flores stayed at 1587 Washington Avenue when they came to the United States from Bolivia.

Morales returned with the car about five to fifteen minutes after he had left. He exited the car and spoke further with Sanchez, after which Sanchez told Fumorala, "Well, it looks like the thing is going to be fixed." Sanchez and Fumorala entered the car and drove off leaving Morales on Miami Beach. Sanchez and Fumorala then went to rent another car for Kibble. Sanchez paid for it with his American Express card. Fumorala drove the rental car and followed Sanchez who was driving his own car.

The following day, December 18, 1986, the story came to a conclusion as Sanchez came to the hotel to take Agent Kibble and the informant Fumorala to Sanchez's home in order to consummate the cocaine exchange. Although Fumorala and Kibble had expected to begin with a purchase of five kilograms of cocaine, Sanchez explained that a problem had arisen and that they would first exchange one kilogram. It was agreed that Agent Kibble would test the first kilogram and pay for it, before the owner of the cocaine would come forward with the rest of the deal. Sanchez drove his own car, and Fumorala and Kibble followed in the rented vehicle.

The three of them entered Sanchez's home and waited a few minutes for his mother-in-law to leave. Sanchez went into one of the bedrooms and exited carrying a portfolio into the living room. He extracted a package of cocaine saying that it was of very high quality. Agent Kibble tested it and the package was re-wrapped. The plan then called for Agent Kibble and Sanchez to go together to obtain some $22,000 in cash from a bank to pay for the first kilogram. Sanchez indicated that once the first payment was made, they would begin to exchange the other kilograms of cocaine.

Before leaving the house, Sanchez called to another person from the bedroom to come into the living room. That person was co-defendant Morales, the same individual who had taken Sanchez's car the evening before on Miami Beach. Kibble said that he did not want to meet anyone else and Morales returned to the bedroom. Thereafter, they took the kilo of cocaine from the house to Sanchez's car and locked it in the trunk. Sanchez and Kibble then drove off in the rented car, and Fumorala remained waiting for them at the Sanchez home.

Morales again left the bedroom and called for still another person to come out —Eduardo Flores. Flores and Morales expressed pleasure that they had established a good connection for trade with Europe. Morales assured Fumorala that Fumorala's boss would be happy with the quality of the cocaine and that they had more merchandise of the same type and quality. Morales further explained that in Miami they liked to deal first for one kilogram "to break the ice." Flores added that things were "rotten" in Miami because there were so many people in jail for dealing in drugs.

Sanchez and Kibble had been gone for about fifteen minutes when the telephone rang at the Sanchez home. Morales answered it and Fumorala overheard Morales say "Be cool, man. The people have gone over to get the money. These are serious people. No sweat. The man is here, one of the employees of these people. And he is an all right guy." When Morales hung up, Fumorala inquired as to whether there was a problem because Morales appeared to be nervous. Morales said there was no problem, but Fumorala pressed him for an explanation. Morales said: "Look, the owner of the merchandise is in a parking lot nearby where there are four kilos. There are four kilos in a nearby parking lot. So that upon your friend, the Englishman, paying for this kilo, the people will bring the other four kilos in order to conduct the second operation."

The telephone again rang and Fumorala discerned that Morales and the caller were engaged in an argument. Morales kept telling the caller, "No sweat. No problem." When Fumorala offered to speak to the caller, Morales said no, again offering that there was "no problem," and he hung up. Then Morales explained, *"Look, the person I was talking to is the person whom you saw yesterday at the Sofitel, because when Sanchez arrived at the Sofitel, ... I was in the back seat when the owner of the merchandise got out."* (emphasis added). Fumorala asked Morales "what man" was he speaking of and Morales repeated that "[i]t is the person you saw yesterday when he came out of the car."

Morales then instructed Flores to go to the parking lot in order to bring the four remaining kilos of cocaine back to the Sanchez home to avoid any further loss of time. Morales explained to Flores that Flores had to go to the parking lot right away because the person waiting there had to go "to the port to get lobster." Flores left. Soon thereafter Agent Kibble and Sanchez returned to the home and Morales and Sanchez were arrested by federal agents.

Surveillance agents followed Flores, who walked from the Sanchez home to a shopping center three blocks away. There Flores walked directly up to the Defendant Marrero and a younger man. The three exchanged greetings and shook hands. After a few minutes the third man left the shopping center, driving away in a pick-up truck. The surveillance agents were unable to follow the truck. Flores sat next to the Defendant Marrero on a bench at the shopping center within a few feet of a public telephone. To the surveillance agents they appeared to be engaged in conversation but what they said could not be overheard. After the Defendant Marrero and Flores had been together for about twenty minutes on the park bench, they were arrested at the shopping center.

### III.

In order to find the Defendant Marrero guilty of conspiracy, the Government had to demonstrate that an illegal agreement existed and that the Defendant Marrero knowingly and voluntarily joined it. *United States v. Bascaro,* 742 F.2d 1335, 1359 (11th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985). Circumstantial evidence such as the conduct of the participants may be used to prove the agreement. *United States v. Miller,* 693 F.2d 1051, 1053 (11th Cir.1982); *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983). While a defendant's presence *alone* is clearly not sufficient to prove guilt, it is a material and probative factor which the jury properly could have considered in reaching its verdict. *United States v. Alvarez,* 755 F.2d 830, 854 (11th Cir.1985), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985); *United States v. Bain,* 736 F.2d 1480, 1485 (11th Cir.), *cert. denied,* 469 U.S. 937, 105 S.Ct. 340, 83 L.Ed.2d 275 (1984).

Here there is no dispute as to the existence of a conspiracy to distribute cocaine, nor that Sanchez, Flores and Morales were conspirators. The main issue is the admission into evidence of two sets of co-conspirator's statements—those made by co-defendant Sanchez in the parking lot of the Sofitel Hotel on December 17, 1986, and

those of co-defendant Morales at the Sanchez home on December 18, 1986. Without the receipt of these statements against Defendant Marrero, we believe the evidence would be insufficient to support the verdict.

First, it appears to us that Defendant Marrero's involvement in this crime was sufficiently shown by a *preponderance of the evidence,* even without considering the content of the co-conspirators' statements. Sanchez was eager to work out a cocaine deal and feared that Agent Kibble would leave the country unless Sanchez could convince him to stay and continue the negotiations. Sanchez had already taken Kibble and Fumorala to the Sofitel and arranged to rent a room for them. He left, promising to provide airplane tickets for their return flights to Madrid, Spain. Immediately after Sanchez drove back to the hotel and parked his car, another vehicle, transporting the Defendant Marrero *and* two co-defendants drove up and parked only a few meters from Sanchez. Sanchez immediately walked to the second car as Defendant Marrero emerged from it. And upon reaching the Defendant Marrero, Sanchez displayed the two airline tickets to Marrero. We add that the tickets were not in an envelope and one was opened to display the actual ticket. Then, as Sanchez was speaking with and displaying the tickets to Marrero, both men turned to look at Fumorala, who was approaching them. Defendant Marrero and Sanchez spoke briefly, Marrero re-entered the second car and, with Flores, drove away immediately.

The Defendant Marrero's actions surely suggest participation in the narcotics deal. One can cast about for possibly innocent explanations, but none readily emerge. Marrero's purpose in coming to the Sofitel parking lot along with the co-defendants at precisely the moment Sanchez presented airline tickets to the putative buyers suggests that his purpose was apparently fulfilled at that moment. We think these circumstances standing alone support the admissibility of the statements made by Sanchez to Fumorala immediately following the Defendant Marrero's departure.

However, we do not rest the decision to admit the co-conspirators' statements on this incident alone.

Defendant Marrero's next appearance, if considered alone, was no more incriminating than the first. However, when taken together, and viewed in the precise context of the ongoing narcotics transaction, the events strongly suggest, at least when measured by a preponderance of the evidence, Marrero's knowing participation in the conspiracy. He was observed sitting on a bench in a shopping mall, the next day, conversing with co-defendant Flores, just after Flores was sent to the shopping center to pick up the balance of the cocaine. The shopping center was only three blocks from the Sanchez home, where the first act in a planned series of exchanges of cocaine for cash had just taken place. Moreover, Flores, with whom the Defendant Marrero had been seen the day before in the Sofitel Hotel parking lot, was clearly involved in the cocaine deal. Flores had no other ostensible purpose in going to the shopping center at that time. Indeed, as soon as Flores arrived at the shopping center and saw the Defendant Marrero, he joined him immediately along with an unidentified third person. We add that this did not appear to be a happenstance meeting as Flores did not just speak briefly with Marrero and leave to continue on with his assigned task. Instead Flores acted precisely as if he reached his goal: to make contact with the cocaine source in order to secure the prompt delivery of the balance of the cocaine to the Sanchez home. The third person's act of leaving in the truck after a few minutes was altogether consistent with the immediate plan—to obtain four more kilograms of cocaine. Further, the fact that Flores and Marrero sat and conversed at length in the parking lot near a pay telephone was also consistent with a plan to wait for confirmation that the first part of the delivery had taken place.

The remaining circumstantial evidence linking the Defendant Marrero to the cocaine deal was the proximity of his home to the home of Morales and the location on Miami Beach where Sanchez and Fumorala had waited on the evening of December 17,

1987, while co-defendant Morales drove away in Sanchez's car, only to return in five to fifteen minutes.

■ Although none of these facts and circumstances are conclusive, together they form a preponderance of the evidence sufficient to admit the co-conspirators' statements against the Defendant Marrero. The sum of this evidential presentation surely is greater than its constituent parts. But we are not required to consider the evidence in so stilted a fashion. The Supreme Court has held that, under Fed.R. Evid. 104(a),[2] the content of statements of a co-conspirator may be considered in weighing their admissibility under Fed.R. Evid. 801(d)(2)(E).[3] *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2781–82, 97 L.Ed.2d 144 (1987). This rule allows the admission into evidence of a declaration by co-conspirators if the Government is able to prove by a preponderance of the evidence that (1) the conspiracy existed, (2) the defendant and declarant were members of the conspiracy, and (3) the statement was made in the course of and in furtherance of the illegal agreement. *Bourjaily, supra*, 107 S.Ct. 2778–79; *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988); *see United States v. Chestang*, 849 F.2d 528, 531 (11th Cir.1988). The trial court now may rely upon the content of the very statement whose admissibility is at issue in determining preliminary questions as to the admissibility of the evidence. In this case, however, we do not find it necessary to face the issue whether a court can rely *solely* on the co-conspirator's statements sought to be admitted in making factual determinations under Rule 801(d)(2)(E), because in addition to the co-conspirators' statements, there was additional independent evidence to support the conclusion that the government had established by a preponderance that the Defendant Marrero was a knowing participant in the cocaine conspiracy.

The first set of co-conspirator's statements—made by Sanchez to Fumorala in the Sofitel Hotel parking lot—fit well within the definition. When Fumorala asked Sanchez to explain why the Defendant Marrero and the other two co-conspirators had left so hurriedly, Sanchez responded that Marrero was a "big padrino" and a "great godfather" in Miami,[4] and that Marrero did "not want to know anyone." These statements were made by a co-conspirator during the course of the conspiracy, and to further the aims of the agreement by explaining the role of a participant to the putative buyer of the cocaine. Statements made to obtain the confidence or to allay the suspicions of a co-conspirator are properly admitted as statements in furtherance of a conspiracy. *United States v. Miller*, 664 F.2d 94, 98 (5th Cir. Unit B 1981), *cert. denied*, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). In short, these statements were properly received, we believe, under Fed.R.Evid. 104(a) and 801(d)(2)(E).

Finally, the second and far more critical co-conspirator's statements were made by Morales to Fumorala while Morales, Flores and Fumorala waited for Agent Kibble and co-defendant Sanchez to return with the cash to consummate the first phase of the cocaine deal. Fumorala heard Morales speak to an unidentified caller, heard Morales assure the caller that the deal was progressing smoothly, and, when he questioned Morales, was told that the caller, not only owned the merchandise, but was at that moment in a nearby parking lot with four additional kilos of cocaine. As it

---

**2.** Federal Rule of Evidence 104(a) provides:

(a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

**3.** Federal Rules of Evidence 801(d)(2)(E) provides:

A statement is not hearsay if (2) Admission by party-opponent. The statement is offered against a party and is ... (E) a statement by a conspirator of a party during the course and in furtherance of the conspiracy.

**4.** Fumorala explained in his testimony that he himself had used the term "great godfather" in describing a narcotics dealer to Sanchez.

turned out, the Defendant Marrero was sitting on a park bench in a nearby shopping center beside a public telephone. Morales further told Fumorala that there was no problem with the deal, and most notably, that the caller was the same person Fumorala had seen the preceding day at the Sofitel Hotel when Sanchez arrived in the parking lot with the airplane tickets. These statements were made by a co-conspirator (Morales) during the course of and in furtherance of the conspiracy. They were made as the cocaine transaction unfolded at the very home where the exchange took place, and they, too, were quite apparently made to obtain the confidence or to allay the suspicions of the putative buyer. *See United States v. Dynalectric Company,* 859 F.2d 1559, 1581–82 (11th Cir.1988) (court upheld admission of an anonymous telephone call in furtherance of the conspiracy; the substance of the call was held to bolster that conclusion).

Defendant argues that these statements were improperly admitted because Fumorala had testified that he did not know whether Morales spoke the truth when Morales said that the caller on the telephone was the same person who had been seen the preceding day. Defendant specifically cites to Fumorala's statement that Morales had said "a lot of stuff, a lot of lying."

Defendant's argument falls wide of the mark. The preliminary question concerning admissibility does not turn on the witness Fumorala's belief as to the truth of the declarant Morales' statement. Rather we are required to preliminarily determine, based on all the evidence presented, whether the statement falls within the ambit of Rule 801(d)(2)(E). By any reasonable measure we think these statements, too, fit well within the definition. The Defendant's argument really amounts to a claim that the out-of-court declaration of Morales ought not be given great weight because Fumorala could not vouch for its accuracy. That claim goes to weight not admissibility, and, at all events, was available for the jury to consider.

Under the teaching of *Bourjaily,* "trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case." 107 S.Ct. at 2781. Moreover, this Circuit applies a liberal standard in determining whether a statement was made in furtherance of a conspiracy. *United States v. Santiago,* 837 F.2d at 1549 ("boasts and other conversations may be in furtherance of a conspiracy if such statements are used to obtain the confidence or to allay the suspicions of a co-conspirator," citing to *United States v. Miller, supra* ). We add that the reliability of the Morales statements as to the role of the unidentified participant was extrinsically corroborated by surveilling agents who placed the Defendant Morales at two critical meetings—at the Sofitel Hotel in the parking lot, the preceding day, examining the airplane tickets, and in the shopping center conferring with co-defendant Flores, the next day, as the deal unfolded. And no real claim is made by Defendant Marrero that the witness, Fumorala, did not accurately observe, recall or recount what Morales had told him.

In sum, we find here that, just as in *Bourjaily,* each of the co-conspirators' statements were corroborated by independent evidence leading up to and surrounding the events in which the Defendant Marrero participated. Their admission into evidence was supported by a preponderance of the evidence. And with the addition of these statements we are fully satisfied that the Defendant's guilt was proper beyond a reasonable doubt and that the verdict reached by the jury was supported by the evidence. Accordingly, it is

ORDERED AND ADJUDGED that Defendant Marrero's Motion for a Judgment of Acquittal or in the alternative for a New Trial, is DENIED.

DONE AND ORDERED.