**UNITED STATES of America**

v.

**Antonio Fredy DIAZ, Jacinto Torres, Rudesindo Viveros, Francisco Zubiria, Defendants.**

**No. 98–663–CR–DAVIS.**

United States District Court, S.D. Florida.

Feb. 11, 1999.

Michael Mullaney, Assistant United States Attorney, Miami, FL, for plaintiff.

Philip Horowitz, Miami, Fla., Alvin Entin, Fort Lauderdale, FL, David Tucker, Coral Gables, FL, Allen Kaufman, Oakland Park, FL, for defendants.

*MEMORANDUM OPINION ON DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL*

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon the following motions:

(1) Defendant Antonio Fredy Diaz's motion for judgment of acquittal;

(2) Defendant Jacinto Torres' motion for judgment of acquittal pursuant to FRCP 29 or, in the alternative, motion for judgment notwithstanding the verdict;

(3) Defendant Rudesindo Viveros' motion to adopt co-defendant Diaz's motion; and

(4) Defendant Francisco Zubiria's motion to adopt co-defendants Diaz's and Torres' motions.

### PROCEDURAL BACKGROUND

On August 28, 1998, the grand jury charged Defendants Diaz, Torres, Viveros and Zubiria, and five others, with the commission of the following crimes:

Count I: conspiracy to possess cocaine with intent to distribute it, while on board a vessel subject to the jurisdiction of the United States, in violation of Title 46, United States Code Appendix, Section 1903(j); and

Count II: possession of cocaine with intent to distribute it, while on board a vessel subject to the jurisdiction of the United States, in violation of Title 46, United States Code Appendix, Section 1903(a). In this count, the defendants were also charged under the aiding and abetting statute, Title 18, United States Code, Section 2.[1]

All ten of the charged defendants were part of the thirteen-member crew of the M/V Isamar, a Panamanian vessel that was boarded by the United States Coast Guard on August 15, 1998, approximately forty miles south of the island of Hispaniola.[2] At the time, the M/V Isamar was returning from Venezuela to Miami, Florida. After an initial inspection, the Coast Guard boarding party sought and obtained a Statement of No Objection ("SNO") from the Government of Panama. As a result of the SNO, and by operation of 46 App. U.S.C. § 1903(c)(1)(C), the M/V Isamar became a vessel subject to the jurisdiction of the United States.[3] Upon her arrival in Miami, the M/V Isamar was searched for contraband by Customs Inspectors. During the course of the search, the inspectors discovered approximately 5,000 pounds of cocaine stored inside a container that was on the deck of the vessel.

The trial of Defendants Diaz, Torres, Viveros and Zubiria, along with four others, took place during the period from January 11, 1999 to January 19, 1999.[4] At the close of the government's case in chief, the Court entertained motions for judgment of acquittal from all eight defendants, pursuant to *Fed.R.Crim.P.* 29(a). The Court reserved ruling, in accordance with *Fed.R.Crim.P.* 29(b), as to Defendants Diaz, Torres, Viveros and Zubiria, and denied the motion as to the other four defendants. At the close of all the evidence, the defendants renewed their respective motions for judgment of acquittal. The Court, again, reserved as to Diaz, Torres, Viveros and Zubiria and denied the others' motions. The jury found all eight defendants guilty as to both counts of the indictment. Pursuant to the Court's instructions, Diaz and Torres have filed

---

1. On December 18, 1998, a tenth defendant was charged with the commission of these crimes by way of a superseding indictment.

2. The other three crew members were not charged.

3. Section 1903(c)(1)(C) provides: "For purposes of this section, a 'vessel subject to the jurisdiction of the United States' includes—a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States."

4. The two other defendants were severed from this trial. Counsel for one defendant requested and obtained a continuance, due to a medical emergency. As to the tenth defendant, who had been charged by way of superseding indictment on December 18, 1998, the minimum 30–day pre-trial period had not yet elapsed. *See* 18 U.S.C. § 3161(c)(2) ("Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.").

briefs in support of their respective motions for judgment of acquittal (which Viveros and Zubiria have adopted); and the government has filed a responsive brief. Thus, the matter is ripe for ruling.

## STANDARD OF REVIEW

*Fed.R.Crim.P.* 29(a) provides that the Court "shall order the entry of judgment of acquittal of one or more offenses charged in the indictment ... if the evidence is insufficient to sustain a conviction of such offense or offenses." In considering a motion for judgment of acquittal, pursuant to *Fed.R.Crim.P.* 29, the Court must:

1. View the evidence in the light most favorable to the Government; and

2. Determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. O'Keefe,* 825 F.2d 314, 319 (11th Cir.1987).

"[T]he evidence need not be wholly inconsistent with every reasonable hypothesis except that of guilt ... as long as the evidence supports [a] jury's conclusion that the defendant is guilty beyond a reasonable doubt." *United States v. Marrero,* 708 F.Supp. 1279, 1280 (S.D.Fla.1989). "In a criminal case, the ultimate burden on the government is the ability to draw a reasonable inference, and not a speculation, of guilt." *United States v. Villegas,* 911 F.2d 623, 628 (11th Cir.1990), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991).

Because the Court reserved on motions that were made prior to submission of the case to the jury, *Fed.R.Crim.P.* 29(b) requires that the motions be decided on the basis of the evidence at the time of reservation. Thus, the Court must consider the motions in light of the evidence presented in the government's case in chief.[5]

## STATEMENT OF FACTS ADDUCED AT TRIAL

The evidence adduced by the government during its case in chief, viewed in the light most favorable to it, is as follows. On August 15, 1998, the United States Coast Guard Cutter Valiant approached the M/V Isamar at sea. Upon questioning regarding its destination, the Isamar indicated she was bound for Miami, Florida from Venezuela. After receiving permission from the first officer, via radio communications, a party from the Valiant, led by Petty Officer Jason Coder, boarded the Isamar. At Officer Coder's request, the thirteen-member crew of the Isamar mustered on deck. Officer Coder and boarding his party then proceeded to conduct a safety inspection, at the conclusion of which they sought and obtained permission from the captain to search for contraband. In the engine room area, the searchers found fresh paint and new welds which, in the opinion of Officer Coder, could have been evidence of a hidden compartment. The Coast Guard officers then requested access to certain oil tanks, but encountered some resistance from the first engineer. Based on these preliminary findings, Officer Coder sought and obtained an SNO from the Government of Panama.[6] While on board the Isamar, the Coast Guard party encountered no resistance from any members of the crew, other than the first engineer's recalcitrance with regard to inspection of the oil tanks. Also, Coast Guard personnel did not observe any signs of nervousness on the part of any crew member. An ion scan was conducted on various parts of the vessel for the purpose of detecting the presence of cocaine. No positive readings were obtained, even on

---

**5.** Defendant Diaz has requested that, in light of the second reservation of ruling at the close of all the evidence, the Court consider the sufficiency of the entire evidentiary record, including the testimony of defendants' expert witness, Mr. Wayne Morris. The Court finds no necessity for conducting this second analysis.

**6.** As previously noted, this resulted in rendering the Isamar subject to the jurisdiction of the United States.

the seal of the door to the container where the cocaine was ultimately found.

When the Isamar arrived in Miami, Customs Inspectors conducted a search of all containers aboard the vessel. They found 5,000 pounds of cocaine, worth over $34 million, inside a sealed container. The container had been labeled with hazardous material warning stickers. It sat directly aside the wheelhouse, immediately adjacent to an opening on the side of the ship. The handle that opened the container had been secured to the door by means of a loosely screwed bolt. The nut on the inside of the door had been glued in some manner, so as to allow the bolt to pass through it when the door was closed. As a result of these manipulations, the container's door could be opened and closed without disturbing the seal.

Inside the container, Customs officials found approximately 86 bales of cocaine laying unconcealed. Each bale was wrapped with approximately five layers of material, including one layer of waterproof rubber wrapping sandwiched between two layers of tape. Each bale was also encased in rope mesh, with a long line, capable of floating, snaked through each casing. Clevis pins, inserted through rope handles, were attached to most of the bales so they could be hooked or grabbed with ease. According to the opinion of Special U.S. Customs Agent Joseph Goulet, who testified as the government's expert, the cocaine was packaged in this fashion for the dual purposes of: (1) loading it aboard the Isamar while the vessel was at sea; and (2) unloading it off the Isamar, also while at sea, prior to the vessel's reaching its destination port of Miami.[7]

Agent Goulet also rendered an opinion regarding the nature of the Isamar's voyage, based on his examination of the ship's logs, charts and other documents that were seized upon her arrival in Miami.

Agent Goulet noted that, after the Isamar's departure from its last port of call—Punto Fijo, Venezuela—there was a twenty-four hour gap in the log's entries. According to Agent Goulet, it was during this time period that the sea-transfer of the cocaine to the Isamar occurred.

Prior to her most recent voyage, the Isamar, a 260–foot coastal freighter, had been used to carry cargo between Florida and South America by Caribbean Lines, C.A. The company had previously used the services of Captain Alfredo Polanco to master the vessel on those trips. For this last sailing, however, Polanco had purchased the vessel from Caribbean Lines. The trip commenced in July, 1998, when the Isamar left Miami for Venezuela with a cargo of goods. For the return leg, she picked up approximately twenty-nine empty containers, along with some cargo. Transportation of empty containers back to Miami is a normal occurrence due to the higher flow of goods from the United States to South America than viceversa.

The container in which the cocaine was found was delivered to Venezuelan Customs authorities by Operaciones Al Sur Del Orinoco, C.A. for transshipment to Miami. According to the manifest, it carried cylinders of flammable gas.[8] After inspection and sealing by Venezuelan Customs personnel, the container was stored at a dock warehouse until it was loaded on board the Isamar on August 3, 1998. The seal was not disturbed until the vessel was searched in Miami.

Defendants Jacinto Torres and Rudesindo Viveros were listed in the ship's documents as the second and third engineers, respectively. Defendants Antonio Fredy Diaz and Francisco Zubiria were listed as seamen, with Zubiria also documented as the third cook. According to the ship's logs, Viveros and Jimenez both acted as

---

7. Viewing the evidence in the light most favorable to the government, the Court accepts Agent Goulet's opinion testimony in its entirety.

8. As previously noted, the container bore warning labels regarding the hazardous nature of its cargo.

"watch officers" on the bridge at some point during the voyage. No traces of cocaine were found on any of these crew members, or on their personal effects.[9]

## DISCUSSION

 In cases involving the crewmen of boats carrying large amounts of contraband, the Eleventh Circuit teaches that a court reviewing the sufficiency of the evidence in such cases should conduct "an examination of all of the proved circumstances, including presence, to determine whether from them a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation." *United States v. Cruz–Valdez*, 773 F.2d 1541, 1545 (11th Cir.1985), *cert. denied sub nom, Ariza–Fuentas v. United States*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). In its analysis of the proved circumstances, the court should focus on the following factors:

> 1) probable length of the voyage, 2) the size of the contraband shipment, 3) the necessarily close relationship between captain and crew, 4) the obviousness of the contraband, and 5) other factors, such as suspicious behavior or diversionary maneuvers before apprehension, attempts to flee, inculpatory statements made after apprehension, witnessed participation of the crew, and the absence of supplies or equipment necessary to the vessel's intended use.

*United States v. Garate–Vergara*, 942 F.2d 1543, 1547 (11th Cir.1991), *cert. denied sub nom, Contreras v. United States*, 502 U.S. 1110, 112 S.Ct. 1212, 117 L.Ed.2d 451 (1992) (citing *Cruz–Valdez*, 773 F.2d at 1546–47).

 In this case, the length of the voyage was approximately one month. The size of the contraband shipment was 5,000 pounds. Other than being under his command aboard a 260–foot vessel during a month-long voyage, there is no evidence

establishing any relationship between the captain of the Isamar and crew members Torres, Viveros, Diaz, and Zubiria. There was evidence from which it could be inferred that the captain had a separate cabin, since personal belongings of one of the crew members—a woman cook who was not charged in the indictment—were reportedly found at that location. However, the government introduced no evidence detailing the lay-out of the ship or the location of the crew's quarters in relation to the wheelhouse or the captain's cabin. The contraband itself was not at all obvious, since it was carried inside a sealed container. The container itself may be said to have been placed in a prominent location, next to the wheelhouse. None of the other factors listed in *Garate–Vergara*; i.e., suspicious behavior or diversionary maneuvers before apprehension; attempts to flee; inculpatory statements made after apprehension; witnessed participation of the crew; or the absence of supplies or equipment necessary to the vessel's intended use, are present in this case. Moreover, no evidence linking Torres, Viveros, Diaz, and Zubiria to the cocaine; i.e., traces on their persons or belonging, was presented at trial.

Thus, the evidence adduced by the government only proves that the defendants were present on board a 260–foot cargo vessel in which a large shipment of cocaine was being transported inside a sealed container. While the evidence, viewed in the light most favorable to the government, is that the cocaine was loaded at sea, no evidence was presented linking Torres, Viveros, Diaz, and Zubiria to the handling of the cocaine during the transfer. Moreover, in the absence of a lay-out proving otherwise, the size of the ship militates against an inference that the crew operated in close quarters. The positions of Torres, Viveros, Diaz, and Zubiria on the crew's hierarchy (second engineer, third

---

**9.** In fact, no traces of cocaine were found anywhere on the ship, except, obviously, in- side the container.

engineer, seaman, seaman/third cook) afforded them no decision-making powers. Although the ship's logs show that two of the defendants acted as lookouts at some point in the voyage, nothing in the evidence supports an inference that they had any input into the purpose or timing of the assignments. It cannot even be said that their lookout postings coincided with the sea transfer, since the government's expert's opinion is that the transfer occurred during a time-gap in the ship's logs and documentation.

In its brief opposing the defendants' motions, the government invokes the well-established premise that "a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders." *See Cruz–Valdez*, 773 F.2d at 1546. Were this the only consideration necessary to establish guilt, no crewman aboard a drug-laden vessel would escape conviction. However, the Eleventh Circuit teaches that more than mere presence is necessary to support a finding, beyond a reasonable doubt, of knowing and intentional participation in a drug smuggling operation. In this case, the government failed to present this required quantum of additional proof with respect to Torres, Viveros, Diaz, and Zubiria. Therefore, the Court grants their respective motions for judgment of acquittal.

## CONCLUSION

Based on the foregoing considerations, it is

ORDERED AND ADJUDGED as follows:

(1) Defendant Rudesindo Viveros' motion to adopt co-defendant Diaz's motion is GRANTED.

(2) Defendant Francisco Zubiria's motion to adopt co-defendants Diaz's and Torres' motions is GRANTED.

(3) Defendants Antonio Fredy Diaz's, Jacinto Torres', Rudesindo Viveros' and Francisco Zubiria's respective motions for judgment of acquittal are GRANTED.

(4) Defendant Jacinto Torres' alternative motion for judgment notwithstanding the verdict is DENIED as moot.

(5) The Court shall enter judgments of acquittal as to all four defendants by separate order.